Mary E. **RICKERT**, Personal Representative of the Estate of Thomas J. Rickert, deceased, Plaintiff,

v.

**MITSUBISHI HEAVY INDUSTRIES, LTD.,** a Japanese corporation; et al., Defendants.

No. 95–CV–0072–B.

United States District Court, D. Wyoming.

April 12, 1996.

Bruce A. Lampert, Richard F. Schaden, Denver, CO, for Plaintiff.

Marshall S. Turner, Andrew T. Houghton, New York City, Bruce S. Asay, Cheyenne, WY, for Defendants.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

Mitsubishi has filed a motion for summary judgment based on its argument that the General Aviation Revitalization Act's statute of limitations bars Rickert's claims. Rickert opposes Mitsubishi's motion on the ground that her claims fit within the misrepresentation exception to GARA's statute of limitations.

### Background

In the pre-dawn hours of April 6, 1993, Casper Air Service pilot Thomas Rickert began his approach to the Casper Airport. Enveloped by darkness and snow, with the low-slung clouds breaking a mere 400 feet above the ground, Rickert relied on his instruments to guide his descent.

Approximately 8 miles from the airport, there is a tall ridge. If Rickert ever saw the ridge, he saw it too late. His plane, carrying a heart attack patient and two medical assistants, slammed into the ridge and exploded, killing everyone aboard.

This essentially is a wrongful death action arising from that unfortunate crash. Mary Rickert, Thomas Rickert's widow and the executor of his estate, alleges that the plane he was flying, a Mitsubishi MU–2B–35–J twin-engine aircraft, was defectively and negligently designed. Though Rickert initially asserted multiple causes of action against a number of defendants, the lone remaining defendant is Mitsubishi Heavy Industries ("Mitsubishi"). Rickert bases her two claims against Mitsubishi on negligence and strict liability.

### Summary Judgment Standards

The standards for summary judgment are well known and can be found in nearly every volume of the Federal Reporter and Federal Supplement. *See Sapp v. Cunningham,* 847 F.Supp. 893, 897 (D.Wyo.1994) (Brimmer, J.); *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990); *see also* W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions* (Federal Judicial Center 1991) (explicating summary judgment standards). The Court will apply these standards, but will not repeat them here.

The Court emphasizes, however, that it evaluates the record in the light most favorable to the non-moving party (i.e., Rickert), *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), and that it neither weighs the evidence nor assesses credibility. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### Analysis

#### I. THE GENERAL AVIATION REVITALIZATION ACT

The General Aviation Revitalization Act of 1994 ("GARA") is one of those increasingly rare statutes whose purpose is evident from both its title and operation. In an effort to "revitalize" the general aviation industry, Congress passed (and the President signed on August 17, 1994) a statute of repose that protects general aviation manufacturers from the uncertainties and costs associated with "long tail" liability. Although there are differences of opinion over the reasons for the general aviation industry's decline, the consensus in Congress was that the industry "had been decimated by spiraling litigation costs." C. McNatt and S. England, *The*

*Push for Statutes of Repose in General Aviation*, 23 Transp. L.J. 323, 324 (Fall 1995). Many people attributed this "decimation" to the fact that general aviation product manufacturers could face lawsuits—based on alleged design or manufacturing defects—filed ten, twenty, thirty, or even forty years after the product involved had been injected into the marketplace.[1] Believing that an upward litigation cost spiral had caused a near fatal industry freefall, Congress and the President enacted GARA.[2]

Simply put, GARA shields aircraft manufacturers and aircraft component part manufacturers from liability lawsuits that arise more than 18 years after the manufacture of a plane or a part involved in an accident. 49 U.S.C. § 40101 note, Section 2(a) and Section 3(3). GARA applies to all "general aviation aircraft," which the Act defines as any aircraft: (1) for which the FAA has issued a type or airworthiness certificate; (2) that carries fewer than 20 people; and (3) which is not engaged in passenger carrying operations at the time of the accident. *Id.* at Section 2(c).

There are four exceptions to GARA's 18 year statute of limitations. This period of repose does not apply to cases in which: (1) the manufacturer knowingly misrepresents or conceals certain safety information to or from the FAA; (2) the claimant was a passenger for purposes of receiving medical or emergency treatment; (3) the claimant who suffers harm was not aboard the aircraft at the time of accident; and (4) the claimant's cause of action is based on the manufacturer's written warranties. *Id.* at Section 2(b)(1)–(4). GARA also does not apply to any lawsuits "commenced" (i.e., filed) before August 17, 1994. *Id.* at Section 4(b).

As for caselaw interpreting and applying GARA, there is little. The Court is aware of

only two district court decisions applying GARA. In the first (and the only reported decision), the court granted summary judgment after the defendant, Bell Helicopter, produced undisputed evidence that the aircraft at issue was more than 18 years old at the time of accident. *Altseimer v. Bell Helicopter Textron, Inc.,* 919 F.Supp. 340, 342 (E.D.Cal.1996). In so holding, the court recognized that the result, "[a]lthough harsh," is consistent with GARA's purpose, which is to "establish a Federal statute of repose to protect general aviation manufacturers from long-term liability in those instances where a particular aircraft has been in operation for a considerable number of years." *Id.*

In the second case (an unreported decision), the court granted summary judgment for the defendant, an aircraft component part manufacturer, after concluding that the plaintiff's evidence failed "to satisfy the very particular requirements of [GARA's] 'knowing misrepresentation or concealment' exception to the limitations period." *Cartman v. Textron Lycoming Reciprocating Eng. Div., et al.,* No. 94–CV–72582–DT at 7, 1996 WL 316575 (E.D.Mich. Feb. 28, 1996). With respect to these requirements, the court noted that the "knowing misrepresentation" exception does not apply "merely because a defendant has not informed the FAA about ... possible safety concerns regarding a part...." *Id.*

## II. GARA APPLIES TO THIS CASE

Mitsubishi asserts and Rickert admits that the aircraft at issue in this case, the MU–2B–35, fits within GARA's definition of "general aviation aircraft." This means, in other words, that the FAA had issued a type certificate for the aircraft, that it carried less than twenty people, and that it was not carrying scheduled passengers at the time of the accident.

---

1. P. Shea, *Solving America's General Aviation Crisis: The Advantages of Federal Preemption over Tort Reform,* 80 Cornell L.Rev. 747 (March 1995); G. Hand, *Should Juries Decide Aircraft Design? Cleveland v. Piper Aircraft and Federal Preemption of State Tort Law,* 29 U.S.F. L.Rev. 741 (Spring 1995); *but see* J. Salmon, *Aviation Products Liability as the Cause of the Decline in Small Aircraft Manufacturing: An Examination of Possible Solutions,* 19 Am.J.Trial Advoc. 171 (Summer 1995) (questioning whether litigation

crisis existed and whether it caused industry problems).

2. T. McAllister, *A "Tail" of Liability Reform: General Aviation Revitalization Act of 1994,* 23 Transp. L.J. 301 (Fall 1995) (general discussion of GARA and legislative history); D. Moffitt, *The Implications of Tort Reform for General Aviation,* 10 Air & Space Law. 8 (Summer 1995) (same).

Mitsubishi first sold the MU–2B at issue here in April of 1972. Approximately 21 years later, on April 6, 1993, Rickert was piloting the aircraft when it crashed into a ridge near the Casper Airport. Because GARA's 18 year limitations period runs from the date that the manufacturer delivers the aircraft to its first purchaser, *id.* at Section 2(a)(1), GARA bars Rickert's claims unless they fit within one of GARA's four exceptions.

At the time of the accident, Rickert was not a passenger in the MU–2B for purposes of receiving medical or emergency treatment. Rickert was the pilot and therefore was aboard the aircraft at the time of the accident. And, although Rickert initially asserted a breach of warranty claim in this case, the Court dismissed that claim after Rickert confessed Mitsubishi's motion for summary judgment on that issue. This means, therefore, that three of GARA's four exceptions— the "medical treatment" exception, the "not aboard" exception, and the "written warranties" exception [3]—do not apply in this case.

■ The one exception that may apply— and the exception on which Rickert relies—is an exception that the Court will call the "knowing misrepresentation" exception. This exception states that GARA offers no repose:

> if the claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft[,] *knowingly misrepresented* to the [FAA], *or concealed or withheld* from the [FAA], *required information that is material and relevant* to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, *that is causally related to the harm* which the claimant allegedly suffered[.]

*Id.* at Section 2(b)(1) (emphasis added). As is apparent, this exception contains two standards: a pleading standard and a judgment

standard. The pleading standard is an obvious analog to Federal Rule of Civil Procedure 9(b), which requires that parties plead fraud "with particularity." Under GARA, the plaintiff must plead the following matters "with specificity": (1) knowledge; (2) misrepresentation, concealment, or withholding of required information to the FAA; (3) materiality and relevance; and (4) a causal relationship between the harm and the accident.

Although Mitsubishi calls its pleading a "summary judgment motion," its motion in part challenges the adequacy of Rickert's pleadings under GARA. Thus, a portion of Mitsubishi's motion actually is a Rule 12(b)(6) motion to dismiss for failure to state a claim, or a Rule 12(c) motion for judgment on the pleadings. Regardless of the motion's classification, this Court will not grant judgment on the pleadings if, now that discovery is nearly complete, Rickert can produce facts sufficient to create a genuine issue of fact under GARA's "knowing misrepresentation" exception. If Rickert has produced such evidence, the Court will allow her to amend her pleadings accordingly.

As a summary judgment standard, GARA's "knowing misrepresentation" exception requires the parties to prove the absence or presence of a genuine issue of material fact concerning: (1) knowledge; (2) misrepresentation, concealment, or withholding of required information to the FAA; (3) materiality and relevance; and (4) a causal relationship between the harm and the accident. Where, as here, the defendant asserts that the plaintiff cannot produce admissible evidence in support of a "knowing misrepresentation" claim, the Court begins its analysis by examining the plaintiff's response. The Court begins here because if the plaintiff has produced facts to support her "knowing misrepresentation" claim, then it is highly unlikely that the defendant will be able, for summary judgment purposes, to rebut those facts. If, in other words, the plaintiff presents material facts in support of her claim, the defendant can do little more than proffer contrary facts.[4] Faced with two sets of con-

---

**3.** *Id.* at Section 2(b)(2), (3), and (4).

**4.** This, in fact, is what Mitsubishi has done. It has attached an exceptionally copious quantity of

flicting and material facts, the Court cannot grant summary judgment.

## III. RICKERT'S CLAIM UNDER GARA

■ In an effort to demonstrate that there are genuine issues of material fact surrounding her "knowing misrepresentation" claim, Rickert produces two types of evidence: (1) expert reports; and (2) the so-called "Vinton letters." Although Rickert's response to Mitsubishi's motion also discusses the allegations in her complaint and her interrogatory responses, her pleadings are not "evidence" that the Court considers for purposes of summary judgment. Therefore, the Court examines only Rickert's expert reports and the Vinton letters to determine whether this evidence supports Rickert's claim that Mitsubishi knowingly misrepresented required information to, or knowingly concealed required information from, the FAA.

### A. Rickert's Expert Reports

Initially, the Court notes that Rickert's expert, Dr. Kennedy, undoubtedly qualifies as an "expert" under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1992). Kennedy possesses both the education and experience necessary to pass judgment on aeronautical matters such as those at issue in this case.

In his February 19, 1996 affidavit (filed in response to Mitsubishi's motion for summary judgment), Kennedy states that Mitsubishi misrepresented three matters to the FAA. First, he claims that Mitsubishi misrepresented the de-icing systems used on the aircraft. Second, Kennedy asserts that Mitsubishi misrepresented the controllability of the aircraft. Finally, he alleges that Mitsubishi concealed information from the FAA by failing to report what it should have known were serious design defects in the aircraft. Because these assertions are mere conclusions, the Court turns to Kennedy's Rule 26 disclo-

sure statements to determine what factual basis Kennedy has for his opinions.

### 1. The Alleged De–Icing Misrepresentations

In his December 15, 1995 disclosure statement, Kennedy explains the bases for his opinion that Mitsubishi misrepresented the design of the de-icing system to the FAA. Kennedy begins by asserting that the MU–2's "were misrepresented to the FAA in terms of the design of the deice systems used on the aerodynamic surfaces of the aircraft." Aside from the fact that this again is a conclusion, the Court cannot determine from this vague statement whether Mitsubishi represented to the FAA that it used one design but in fact used another, or whether it represented to the FAA that the deicing system had design characteristics that it did not in fact have. Kennedy's next sentence does little to clarify the matter: "This is based on the design reports produced to date which indicate this misrepresentation." Aside from the fact that Kennedy still has failed to identify "specifically" any misrepresentation, Kennedy does not state which design reports "indicate this misrepresentation." Nor does he explain how the design reports are misrepresentations. In his next and final sentence concerning the de-icing misrepresentation, Kennedy asserts that "[t]he deice boots do not extend chordwise a sufficient distance to protect the aerodynamic surfaces." That may be so, but this is either a statement of fact or a statement of opinion; it is not a misrepresentation.

Apparently realizing that this statement might not (and does not) pass muster under GARA's "knowing misrepresentation" exception, Rickert has submitted an amended disclosure statement that Kennedy drafted on February 13, 1996. In this statement, Kennedy begins by noting that the FAA approved the MU–2 for flight in known icing conditions, but that "[t]he aircraft were never tested in actual icing flight at this time." Again, this may be true, but it does not indicate that Mitsubishi misrepresented to,

"factual" materials to its summary judgment motion, apparently in an effort to prove that even if Rickert produces facts to support her claim, Mitsubishi has produced facts that—in either quantity or quality—overwhelm Rickert's case. In do-

ing so, Mitsubishi has forgotten that for purposes of summary judgment, the Court neither weighs evidence nor assesses credibility. The Court, therefore, will not consider Mitsubishi's multi-layered stacks of "evidence."

or concealed anything from, the FAA. Kennedy nowhere states that Mitsubishi told the FAA it conducted such flights, but actually did not, and nowhere alleges that Mitsubishi concealed from the FAA its failure to conduct such flights. Moreover, if the FAA required actual flights into known icing conditions, it certainly could have asked for such flights.

Kennedy next discusses Mitsubishi's use of a "Joukowski 15% airfoil" to make certain calculations relevant to the de-icing characteristics of the MU–2. Kennedy claims, in short, that the Joukowski airfoil is an antiquated design, and that "[a]ny competent aeronautical engineer would know that the Joukowski 15% airfoil is not representative of the airfoils used anywhere on the MU–2B aircraft." Because this airfoil does not represent any of the airfoils actually used on the MU–2, Kennedy asserts, Mitsubishi has misrepresented the aerodynamic properties of this aircraft to the FAA.

If this Court were to accept Kennedy's apparent definition of what constitutes a "misrepresentation," then it would have to conclude that all differences of opinion and mistakes amount to misrepresentations. Once again, it may be true (and this Court accepts as true) that Mitsubishi actually used the Joukowski airfoil for some of its calculations.[5] Nonetheless, this does not mean— and Kennedy has not stated—that Mitsubishi told the FAA it used one airfoil but in fact used the Joukowski airfoil, or that Mitsubishi concealed from the FAA the fact that it used the Joukowski airfoil in its calculations. Mitsubishi may have used the wrong airfoil for its calculations (and the Court will assume that it did), but that is a mistake, not a misrepresentation. Nothing that Kennedy says in his report concerning de-icing leads this Court to conclude that Mitsubishi represented something to the FAA that it knew to be untrue or that it made any representations to the FAA with the intent to deceive. *See* 2 Devitt, Blackmar & O'Malley, *Federal Jury Practice and Instructions* § 37.08 (4th ed.1990) (defining false or fraudulent representations).

### 2. The Alleged "Controllability" Misrepresentations

In his initial disclosure statement, Kennedy opines that "[t]he design decisions which were made by Mitsubishi in the original design placed the aircraft performance above the aircraft safety." As an initial and commonsensical matter, the Court observes that there appears to be an inverse relationship between performance and safety with respect to all modes of transportation, whether it be an aircraft, a car, a motorcycle, or a boat. The faster something goes, the more dangerous it is. Perhaps sensing that this is so and that his statement does not indicate Mitsubishi misrepresented anything to the FAA, Kennedy continues: "This [performance/safety trade-off] was never explained in the certification process and it is my opinion that the aircraft fails to meet CAR 3.106 Controllability." First, this Court cannot find any statute or regulation that requires aircraft manufacturers to notify the FAA every time they make design decisions that to some degree place performance over safety.[6] Second, it may be Kennedy's opinion (which the Court accepts) that the MU–2 fails to meet the controllability regulations, but this failure does not indicate that Mitsubishi misrepresented anything to, or concealed anything from, the FAA.

In his amended disclosure statement, Kennedy amplifies his opinions concerning this design issue. This amplification again demonstrates that the real issue for Kennedy is that he disagrees with Mitsubishi's design decisions, not that Mitsubishi misrepresented anything to the FAA. For instance, Kennedy engages in a lengthy discussion of "wing loading" characteristics and compares the MU–2's wing loading with that of other aircraft. After noting that "the design of the MU–2B series is vastly different than [sic]

---

**5.** Mitsubishi disputes this, and points out that Mitsubishi obtained its airfoil models and data from an FAA document. While this may be true, the Court need not rely on Mitsubishi's evidence on this point.

**6.** Given the nature of aircraft design—which is a process that constantly involves the trade-off between performance and safety with respect to most components—the Court doubts that such a regulation would be either feasible or workable.

other aircraft," Kennedy observes that its design "delivers high cruise speeds, but requires exceptional skill on the part of the pilots flying the aircraft and also requires a special wing configuration to achieve reasonable landing speeds." If we were dealing here with the merits of Rickert's negligence and defective design claims, these opinions would be highly relevant and probative. But at this stage of the proceedings we are concerned with only one issue: whether Mitsubishi misrepresented anything to, or concealed anything from, the FAA. Kennedy's observations concerning these issues simply do not indicate that Mitsubishi deceived the FAA in any way.

In his final paragraph on the controllability issue, Kennedy first notes that the National Transportation Safety Board ordered a special certification review of the MU–2 series aircraft, and that the NTSB ordered the review because of its suspicions that the MU–2's accident rate might be design-related. What he does not note is that this review essentially resulted in a clean bill of health for the MU–2. More importantly, Kennedy fails to link the NTSB's review to any alleged misrepresentations or omissions. Kennedy next cites two magazine articles, both of which report that the MU–2's accident rate is higher than that of similar aircraft. The articles also state that pilots who fly the MU–2 should possess a high degree of skill. Although the Court has doubts about the admissibility of these articles as evidence,[7] it accepts them as true for purposes of this order. Once again, however, the Court notes that while the MU–2 may have a higher accident rate and may demand a greater degree of skill to fly than other aircraft, this does not mean that Mitsubishi misrepresented anything to, or concealed anything from, the FAA.

Kennedy's statements concerning the MU–2's controllability all may be true, but they do not amount to misrepresentations. What they do amount to is a difference of opinion concerning proper design, and Kennedy's belief that the MU–2 fails to meet regulatory

criteria. Nowhere does Kennedy proffer specific facts indicating that Mitsubishi knowingly misrepresented the MU–2's controllability characteristics to the FAA.

### 3. The Alleged "Design" Misrepresentations

In paragraphs 3, 4, and 5 of his report, Kennedy discusses a number of matters that he considers to be "design defects." Although Kennedy's discussion might be of great interest to a jury considering Mitsubishi's liability, it is of less interest to the Court as it considers whether Mitsubishi knowingly misrepresented anything to, or concealed anything from, the FAA.

### a. Airfoil Choice and Flight Tests

Kennedy begins his "design defect" discussion by examining Mitsubishi's choice of airfoils. Kennedy contends (and this Court again accepts as true) that Mitsubishi chose unstable airfoils for the MU–2 and that this choice of airfoils "is a defective design and one that is unreasonably dangerous for the population of pilots that will operate the aircraft." Though it may be "well known and understood," as Kennedy asserts, that the MU–2's airfoils are unstable, this understanding is a fact, not a misrepresentation. Again, nothing that Kennedy says about Mitsubishi's choice of airfoils constitutes a knowing misrepresentation to the FAA.

After criticizing Mitsubishi's choice of airfoils, Kennedy states that "[n]o engineering flight tests in any icing conditions were performed" and that "[n]o engineering flight test in any icing conditions were documented as part of [the type] certification program." These statements, which the Court accepts as true for purposes of this order, would be relevant at this stage of the proceedings only if Mitsubishi represented to the FAA that it performed flight tests in icing conditions but actually did not perform such tests, or if the FAA required such tests and Mitsubishi knowingly concealed its failure to perform such tests from the FAA. Kennedy does not, however, make either statement. Instead, he concludes by noting that it is "par-

---

7. These articles are, of course, hearsay. Although experts are allowed to rely on hearsay to form their independent opinions, they are not allowed to publish hearsay and then adopt the hearsay as their opinion.

ticularly important that the deice boots extend rearward along the upper and lower surfaces to positions where ice will not accrete...." Presumably, Mitsubishi would have been aware of this fact had it performed flight tests into known icing conditions. Again, however, Mitsubishi's failure to perform such tests and its failure to understand these design issues do not constitute knowing misrepresentations to the FAA.

### b. Ice Detection System

Kennedy begins the next section of his report by stating: "The lack of an ice detection system is a defective design for an aircraft that is intended to be flown in known icing conditions. The lack of this system has clearly increased the accident rate in the aircraft." In support of this disconcerting conclusion, Kennedy notes that although an MU–2 pilot might be able to see ice accretion by day, the pilot cannot do so by night. Apparently realizing that this was a problem, in 1992 Mitsubishi recommended that MU–2 owners install ice detection systems. Kennedy points to this fact as evidence that ice detection systems will improve the MU–2's accident rate. He then observes that Mitsubishi has not met its "obligations" by offering this system as an option, and that an ice detection system should have been standard equipment on the MU–2.

Again, all this may be true, and the Court accepts it as true. But this does not mean, and Kennedy has not said, that Mitsubishi misrepresented anything about ice detection systems to the FAA, or that Mitsubishi concealed anything concerning ice detection systems from the FAA.

### c. The Use of "Spoilers" for Roll Control

In his final paragraph concerning MU–2 design issues, Kennedy states that Mitsubishi's decision to use only spoilers (rather than ailerons) for roll control "is a defective design and an unusual application." After engaging in an interesting discussion concerning accepted methods for controlling aircraft "roll," Kennedy observes that the MU–

2's roll control devices are not effective and that this is especially true in icing conditions.

Again, the Court can agree with Kennedy's statements and observations on this issue, but this agreement does not mean that Mitsubishi misrepresented anything to the FAA. Kennedy neither has stated nor shown that Mitsubishi knowingly deceived the FAA when it decided to use spoilers to control the MU–2's roll.

In the end, there is nothing either in Kennedy's December 15, 1995 disclosure statement or in his February 13, 1996 amended disclosure statement which causes this Court to conclude that Mitsubishi knowingly misrepresented anything to, or knowingly concealed anything from, the FAA. Although Kennedy attempts to garb his opinions in the GARA-eluding guise of "misrepresentation," the Court sees his opinions for what they essentially are: differences of opinion concerning design issues.[8] At most, Kennedy's opinions (accepted as true) cause the Court to conclude that Mitsubishi was negligent, perhaps even grossly negligent, when it designed and manufactured the MU–2. Gross negligence is not, however, a knowing misrepresentation. Along these same lines, Mitsubishi's failures to explain its design decisions are not—in the absence of some requirement that it explain such decisions— knowing misrepresentations.

### B. The "Vinton" Letters

On April 1, 1996, Rickert filed "supplemental evidence" in support of her response to Mitsubishi's motion for summary judgment. This evidence consists of five letters between Nakagawa, Mitsubishi's President, and Vinton, who (before the letters were written) had served as General Counsel for a Mitsubishi subsidiary involved in MU–2 production. Because Rickert does not explain the relevance of these letters, the Court assumes that Rickert offers them because they demonstrate that Mitsubishi knowingly misrepresented something about the MU–2 to, or knowingly concealed something about the MU–2 from, the FAA.

---

**8.** Although the Court relies only Kennedy's reports to reach this conclusion, it also notes that Kennedy twice admitted during his deposition

that he was not aware of any facts which caused him to conclude Mitsubishi knowingly withheld or concealed required information from the FAA.

### 1. The Nakagawa Letters

In the first letter (dated March 12, 1990), Nakagawa tells Vinton that Mitsubishi has "always fully cooperated with and assisted all government agencies charged with the responsibility of investigating and prevented aviation accidents." After discussing Mitsubishi's role in assisting the FAA and NTSB, Nakagawa asks Vinton to send any information that Vinton might have which would assist Mitsubishi in its investigations.

In the second letter (dated April 4, 1990), Nakagawa again asks Vinton to provide Mitsubishi with any information he might have concerning Mitsubishi's alleged failure to cooperate with government accident investigators, and any information he has concerning Mitsubishi's alleged concealment of information relevant to any accident. Nakagawa then discusses a recent accident, and asks Vinton to provide him with any evidence he has which links the accident to a product defect. Nakagawa then assures Vinton that Mitsubishi will thoroughly investigate any information that Vinton might provide.

In the third and final letter from Nakagawa to Vinton (dated May 7, 1990), Nakagawa again reassures Vinton that Mitsubishi is concerned about all accidents involving MU–2s, and that it is doing everything within its power to determine the cause of the accidents. He also states that Mitsubishi does not intend to change the MU–2's design unless it determines that the design is related to the accidents. Nakagawa then tells Vinton that the evidence does not support Vinton's theory about airframe icing being the cause of the accidents, but that Mitsubishi is continuing to investigate that issue. In closing, Nakagawa again asks Vinton to provide Mitsubishi with factual support for his theory so that Mitsubishi can take appropriate action.

This Court cannot find anything in these three letters which suggests that Mitsubishi misrepresented anything to, or concealed anything from, the FAA. In each of the letters, Nakagawa is responding to Vinton's concerns about the MU–2 and his opinion that airframe icing is responsible for at least some MU–2 accidents. Although the last letter indicates that Vinton is concerned enough about the issue to approach the appropriate regulatory agencies, this vague indication does not lead to the conclusion (or even create a genuine issue of material fact) that Mitsubishi knowingly misrepresented something about the MU–2 to the FAA.

### 2. The Vinton Response Letters

Vinton responded to Nakagawa's letters on May 16, 1990 and May 24, 1990. In his first letter, Vinton castigates Mitsubishi for being more concerned with product liability lawsuits than with aircraft safety. Continuing in this vein, Vinton states that "[y]ou have convinced me that you have a completely closed and defensive mindset and will not look into the theory suggested to you, therefore further dialogue would be unproductive." In closing, Vinton states that he will do his best to see that the "problem with the long-body MU–2" receives the attention that it needs.

In his May 24 letter, Vinton brings to Nakagawa's attention a letter that had recently appeared in *Aviation International News*. The letter, Vinton notes, was written by Bill Evans, a former MAI test pilot who took the MU–2 through French, German, and Italian flight certification. In that letter, Evans writes about his experiences with the MU–2 and icing. He also states (a statement that Vinton quotes to Nakagawa): "I would earnestly recommend that in the future, in order to save lives, FAA certification for flights into known-icing conditions is withdrawn until further tests are conducted into the flight characteristics of the MU–2 in icing conditions." After summarizing the contents of Evans' letter, Vinton closes by stating that Mitsubishi apparently has no interest in exploring a viable theory, icing, as the cause of many MU–2 accidents.

For purposes of this order, the Court accepts Vinton's statements as true, and goes further by relying on the letters to draw negative inferences against Mitsubishi. Having done so, the Court cannot conclude that Vinton's letters show anything other than that Mitsubishi has, with respect to the design and performance of the MU–2, been obstinate, short-sighted, negligent, and perhaps reckless. Again, however, this does not mean that Mitsubishi knowingly misrepre-

**1462**

sented anything to, or concealed anything from, the FAA. Under GARA, Vinton's letters must create a genuine issue of material fact by setting forth specific facts indicating that Mitsubishi knowingly misrepresented something to, or concealed something from, the FAA. His letters do not meet this test.

### C. Rickert's "Other" Evidence

Although Rickert relies primarily (if not exclusively) on Kennedy's reports and the Vinton letters to support her response to Mitsubishi's motion for summary judgment, she also has attached a number of other items to her response. The Court will examine each of these briefly.

The first item is a Robert E. Breiling Associates report titled "1994 Business Turboprop Accidents/Incidents." The report contains statistics on the number of MU–2 accidents in 1994 and in past years. Because of the MU–2's high accident rate, the report also contains a more detailed examination of MU–2 accidents. Although these statistics and analyses might be useful at a trial, they do not demonstrate—and the report does not allege—that Mitsubishi knowingly misrepresented anything to, or concealed anything from, the FAA.

The second item is a magazine article published in *AOPA Pilot* magazine. The article is a review of the Mitsubishi MU–2. In a nutshell, the article states that the MU–2 is a high performance aircraft that also is dangerous. Again, the article nowhere suggests that Mitsubishi misrepresented the MU–2 to the FAA, or that it concealed information concerning the MU–2 to the FAA. The MU–2's accident rate simply is not relevant to GARA's misrepresentation or concealment inquiry.

The third item is a "List of MU–2 Crashes" that a Texas state court allegedly found to be similar accidents in icing conditions. Even if this document had any foundation and was true, it does not show that Mitsubishi deceived the FAA in any way.

The fourth and fifth items are two of the Vinton letters, which the Court already has discussed. The sixth item is a copy of the Code of Federal Regulations concerning the

reporting of failures; the seventh item is a copy of Rickert's amended complaint; and the eighth item is a copy of her supplemental interrogatory responses. None of these items provide factual support for Rickert's allegation of deception. And the final item is Kennedy's expert report, which the Court already has discussed.

The Court thus has canvassed the entirety of Rickert's evidence, and cannot find anything which creates a genuine issue of material fact on the issue of whether Mitsubishi knowingly misrepresented something about the MU–2 to the FAA, or on the issue of whether Mitsubishi knowingly concealed anything about the MU–2 from the FAA.

### Conclusion

The terms "misrepresentation" and "concealment" are not infinitely malleable. Rickert cannot avoid GARA's period of repose simply by dressing up her evidence (most of which would be relevant to and probative of the issues of negligence and strict liability) as "misrepresentations" and "concealments." GARA requires more than innuendo and inference; it demands "specificity." Rickert has not met GARA's demands in this case.

Therefore, the Court **ORDERS** that Mitsubishi's motion for summary judgment is granted and Rickert's claims are dismissed with prejudice. The parties shall bear their own costs.