[No. B152609. Second Dist., Div. Eight. June 13, 2003.]

MARIA BUTLER et al., Plaintiffs and Appellants, v.
BELL HELICOPTER TEXTRON, INC., et al., Defendants and
Respondents.

**COUNSEL**

Baum, Hedlund, Aristei, Guilford & Schiavo and Robert E. Guilford for Plaintiffs and Appellants Maria Butler, Lisa Reiner and Lorene McComb.

Law Offices of Richard P. Louis and Richard P. Louis for Plaintiffs and Appellants Steven L. Robinson and Jennifer Ann Robinson.

Law Offices of Stephen K. Brunk and Stephen K. Brunk; Shea & Gardner, Frederick C. Schafrick and J. Chad Oppenheimer for Defendants and Respondents.

## OPINION

## BOLAND, J.—

### SUMMARY

Bell Helicopter Textron, Inc., is the manufacturer of a helicopter that crashed in Griffith Park on March 23, 1998. The crash was caused by the in-flight failure of the helicopter's tail rotor yoke. The two survivors and the successors of four others who died in the crash sued Bell Helicopter and others, asserting products liability theories of strict liability, negligence, warranty and fraud. Bell sought summary judgment based on a federal statute of repose, which bars actions against manufacturers of general aviation aircraft if the part that allegedly caused the accident is more than 18 years old.

We conclude an exception to the statute of repose applies, precluding its application to this lawsuit. An action is excepted from the statute of repose if the claimant proves the manufacturer concealed or withheld from the Federal Aviation Administration (FAA) "required information" material to the maintenance or operation of the aircraft or part that is causally related to the harm. There is evidence Bell Helicopter Textron, Inc., within the period of repose, withheld information from the FAA about five military aircraft accidents Bell knew were caused by the failure of identical tail rotor yokes installed on those aircraft. We hold that FAA regulations required Bell to report those failures, and its withholding of that information falls squarely within the statutory exception to the time limitations on civil actions that would otherwise apply. We therefore reverse the judgment of the trial court and remand the cause for further proceedings.

### FACTUAL, PROCEDURAL AND LEGAL BACKGROUND

Bell Helicopter Textron, Inc. (Bell), manufactured a helicopter that crashed on March 23, 1998, during a rescue airlift following an automobile accident. The accident victim and three paramedics—Michael Butler, Michael McComb and Eric Reiner—were killed, and pilot Steven Robinson and another paramedic were seriously injured. The crash was caused by the in-flight failure of the helicopter's tail rotor yoke. Lawsuits were filed

against Bell; Bell Technical Services, Inc. (BTSI, a Bell affiliate providing customer service for Bell) and Robert A. Gustafson,[1] an employee of BTSI, by the injured crash victims and the successors of those who died (referred to collectively as Butler). The lawsuits filed by the surviving paramedic and by the successors of the accident victim were settled; the remaining lawsuits are the subject of this appeal.

### 1. *Bell's motion for summary judgment.*

Bell filed a motion for summary judgment.[2] The motion was based upon a federal statute of repose, the General Aviation Revitalization Act of 1994 (GARA).[3] GARA precludes any civil action against a manufacturer of general aviation aircraft if the part that allegedly caused the accident is more than 18 years old.[4] (GARA, §§ 2(a) & 3(3).) Several circumstances may affect the application of the 18-year period of repose. Among them is an exception from the time limitation if the claimant proves the manufacturer "knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, . . . or other part, that is causally related to the harm . . . ." (*Id.*, § 2(b)(1).)

Bell's motion for summary judgment asserted that (a) it sold the helicopter, a model 205A-1, to the Los Angeles Fire Department on March 12, 1976, 22 years before the accident, and (b) the tail rotor yoke that caused the accident was original equipment on the helicopter when it was sold to the department. Bell supported its motion with declarations from Bruce Taylor and Giffen Marr. Taylor's declaration established the date of delivery of the helicopter to the City of Los Angeles, including the tail rotor yoke. Marr, who was in charge of civil certification and regulatory requirements for Bell until December 1999, stated that no information pertaining to the design and

---

[1]Gustafson died after the litigation began, and the lawsuits proceeded against his estate.

[2]References to Bell include all three defendants, unless the context requires otherwise.

[3]Public Law No. 103-298 (Aug. 17, 1994), 108 Statutes 1552, as amended by Public Law No. 105-102 (Nov. 20, 1997) section 3(e), 111 Statutes 2215, reproduced at 49 United States Code section 40101, note.

[4]GARA was passed in response to a decline in the manufacture and sale of general aviation aircraft by United States companies, caused in part by an increase in the industry's liability insurance. The legislative history is described in detail in *Burroughs v. Precision Airmotive Corp.* (2000) 78 Cal.App.4th 681, 690-691 [93 Cal.Rptr.2d 124].) " 'In essence, the bill acknowledges that, for those general aviation aircraft and component parts in service beyond the statute of repose, any design or manufacturing defect not prevented or identified by the Federal regulatory process by then should, in most instances, have manifested itself.' " (*Id.* at p. 691, quoting H.R.Rep. No. 103-525(II), 2d Sess. (1994), reprinted in 1994 U.S. Code Cong. & Admin. News, p. 1648.)

safe operation of Bell's type-certificated helicopters was ever deliberately withheld from the FAA.[5]

### 2. *Butler's opposition to Bell's motion.*

Butler opposed Bell's motion, asserting triable issues of material fact as to the applicability of certain exceptions to the statute of repose. Butler asserted Bell knowingly misrepresented or withheld "required information" from the FAA (a) in 1989, when it revised the helicopter's maintenance manual to increase the retirement life of the tail rotor yoke from 4,000 to 5,000 flight hours; (b) in 1996, when it revised the manual to require a new, allegedly defective dimensional test for inspection of the yoke; and (c) throughout the entire period from 1989 to the time of the March 1998 crash.[6]

Most of the facts presented in Butler's opposition are undisputed by Bell.[7] To facilitate comprehensibility, we first describe the cause of the helicopter crash and other pertinent general information, and then relate the facts Butler believes are relevant to the assertion that Bell knowingly misrepresented and concealed required information from the FAA.

### a. *The cause of the accident.*

The tail rotor yoke (referred to as the accident yoke) failed prematurely— after 4,117 hours of flight time—due to "static overload" damage. Static overloads occur when the tail rotor is stationary, not when a helicopter is in

---

[5]In addition, a declaration from A.G. Stravato explained BTSI's function as providing customer service in support of Bell's helicopter fleet around the world, and stated Bell directed and exclusively controlled BTSI's activities in order to fulfill Bell's obligations as the original equipment manufacturer.

[6]Butler also asserted that other statutory provisions prevented application of the statute of repose. The first was a "rolling" provision, applicable when a part of the aircraft is replaced with a new part; if death or injury is caused by a new part added to the aircraft, the 18-year period for the new part begins from the date of completion of the replacement or addition. (GARA, § 2(a)(2).) Butler argued that revisions Bell made to the maintenance manual for the aircraft in 1989 and 1996 were "new parts" that extended the statute of repose under its rolling provision. Butler further asserted the statute of repose did not apply to BTSI and Gustafson because they did not act in the capacity of a manufacturer. On appeal, Butler also contends (a) the paramedics were passengers within the meaning of another statutory exception, which applies if the person for whose injury or death the claim is being made "is a passenger for purposes of receiving treatment for a medical or other emergency . . ." (*id.*, § 2(b)(2)), and (b) unless so interpreted, the statute is unconstitutional. In view of our conclusion that the statute of repose does not apply for other reasons, we need not consider these contentions.

[7]Although Bell objected to the admissibility of portions of Butler's opinion evidence on various grounds, Bell did not reply to Butler's opposition statement of disputed and undisputed facts. The trial court overruled Bell's objections to the affidavit of Russell Boocock, Butler's principal expert.

flight. Static overload can be caused by improper ground handling (such as using the tail rotor blade as a handhold to move the helicopter), collision with a vehicle, improper bearing removal while the yoke is off the helicopter, and wind gust or jet blast. The static overload creates "a loss of compressive residual stress and therefore a fatigue fracture." Bell explained that "Because the yoke is metal, static forces such a[s] striking the part with an object, will cause the yoke to bend. It is the bending of the yoke which causes the loss of the residual stress on the surface of the yoke and its susceptibility to fracture due to fatigue."[8]

Loss of surface compressive residual stress (also referred to as "yielding") is not visually detectable. Until this accident, Bell used a dimensional testing tool to determine if a yoke had been bent so as to cause it to be "yielded." Bell also installed new "flapping stops" to perform the same function. (Flapping stops are flexible metal tabs installed against the yoke so that a bending of the yoke will bend the flapping stops. When the yoke bends back into place, the flapping stops do not, and the bent flaps can be observed on visual inspection.) Bending in the flapping stops requires removal of the yoke for inspection. Loss of compressive residual stress or yielding can be measured directly only by X-ray diffraction testing.

b. *Alleged misrepresentation to and concealment of information from the FAA.*

Butler asserts that Bell withheld from the FAA "required information" material to the performance or the maintenance of the tail rotor yoke on two different occasions, in 1989 and 1996, as well as continuously during this period and up to the time of the crash. Reduced to its essentials, Butler's claim is that (a) Bell knew about and failed to report the failure of identical yokes on five military helicopters, and (b) Bell was required to, but did not, perform additional fatigue testing or analysis to justify its 1989 increase in retirement life of the yoke from 4,000 to 5,000 hours, and therefore misrepresented to the FAA that it had complied with fatigue evaluation regulations.

Butler relied on the following evidence, most of which was described in the affidavit of Russell Boocock, an aeronautical engineer specializing in aircraft structural analysis, static and fatigue, with 38 years of experience with rotorcraft.

(1) *Facts known to Bell in 1989.*

In 1989, Bell increased the retirement life of the tail rotor yokes on model 205A-1 helicopters from 4,000 to 5,000 flight hours. When it did so, Bell had the following information:

---

[8]Fatigue cracking—the propagation of the fatigue crack at its origin—occurs after initiation of fatigue, as the helicopter is operated.

— The tail rotor yokes on model 205A-1 helicopters were identical to the yokes used on some other Bell models, including certain models in military use. Bell engineers knew there had been at least five accidents in which tail rotor yokes failed in military use prior to 1989, each of which involved in-flight fatigue failure after less than 2,400 hours of use.[9] Moreover, as a result of a study conducted by Bell and funded by the Army, Bell engineers knew by August 1989 that the military failures were not caused by the military nature of the helicopter's operation, but by static overload, which would occur regardless of whether the aircraft was involved in civil or military use.

— One conclusion reached in Bell's study of the military failures of the tail rotor yoke was that "any tail rotor yoke in service may be inspected using nondestructive X-ray diffraction techniques to determine the peak compressive strain that the yoke has been subjected to."

— Nevertheless, on October 18, 1989, Bell issued technical bulletin 205-96-80, requiring a change in the maintenance manual for the model 205A-1 helicopter, increasing the retirement life of the tail rotor yoke on the helicopters from 4,000 flight hours to 5,000 flight hours. The design engineering aspects of the bulletin were FAA-approved. The bulletin stated that "[a] review of the service history and fatigue evaluation data for tail rotor yokes P/N 212-010-704-(ALL) and 212-010-744-(ALL), has provided justification for an increase in the retirement life." Bell certified that the data was examined and complied with applicable federal aviation regulation (FAR) requirements, specifically 14 Code of Federal Regulations, part 29.571(c) (2003).

— Part 29.571 (14 C.F.R.) governs fatigue evaluations. In 1989, part 29.571(c) covered "[r]eplacement time evaluation."[10] The regulation stated that "[i]t must be shown that the probability of catastrophic fatigue failure is extremely remote within a replacement time furnished under section A29.4 of Appendix A."[11] (14 C.F.R. § 29.571(c) (1989).)

From these facts, Boocock opined that, in 1989, Bell deceived the FAA by concealing the failure history of the yoke on military aircraft, and falsely

[9] Bell's knowledge of the military failures was confirmed by the deposition testimony of Bell engineers.

[10] The FAR's appear in title 14 of the Code of Federal Regulations. Part 29.571 was amended effective November 27, 1989, to add flaw tolerance requirements to the requirements for fatigue evaluation of structures, and paragraph (c) no longer exists. (See 14 C.F.R. § 29.571 (2003).) The amendment was intended to avoid or reduce catastrophic fatigue failures in transport category rotorcraft. (54 Fed.Reg. 43928 (Oct. 27, 1989).)

[11] Section A29.4 of appendix A requires a manufacturer's "Instructions for Continued Airworthiness" to contain a segregated and distinguishable section titled "Airworthiness Limitations," which sets forth each mandatory replacement time and similar matters approved under part 29.571. (14 C.F.R. § 29, appen. A (2003).)

represented, without performing any additional testing, that the probability of catastrophic in-service fatigue failure prior to the 5,000-hour retirement life was extremely remote. Boocock stated that when Bell increased the retirement life of the yoke, Bell knew it had not met the requirements of 14 Code of Federal Regulations part 29.571(c), "in that it had not substantiated, nor demonstrated, that the likelihood of a catastrophic fatigue failure of the -704 and -744 tail rotor yokes was extremely remote within their revised retirement life of 5000 hours." Boocock also pointed out Bell knew in 1989 that static overload would reduce compressive residual stress, and opined Bell therefore knew "that any increase in retirement life could not, on any rational known engineering substantiation by test or analysis, be made without doing further testing," and could not be made without doing further substantiation of the tail rotor yoke in a yielded or bent condition.[12] A declaration from Hugh E. Waterman, an aeronautical engineer whose work included 27 years with the FAA, described the military failures of the yoke and opined Bell was required to report those failures under 14 Code of Federal Regulations part 21.3, which governs the reporting of specified types of failures, malfunctions and defects to the FAA.

### (2) *Additional facts learned by Bell after 1989.*

In 1992, Bell had completed the second phase of its study of the military yoke failures. This study included a fatigue test of preconditioned—that is, pre-bent or "yielded"—yokes. These pre-bent or "yielded" yokes were tested for fatigue strength, and showed a 40 percent degradation in fatigue strength. A 2,995-hour fatigue life for the yielded yoke in military use was calculated based on the yielded yoke's reduced endurance limit. The study concluded, conservatively, that the preconditioned yokes represented yokes that just barely passed a dimensional inspection, so that "as long as a yoke can pass a dimensional inspection the current recommended retirement life of 2,400 hours is still appropriate."

In 1996, Bell issued an "Alert Service Bulletin" to provide inspection requirements, including dimensional testing with a special tool, for continued airworthiness of the yokes on model 205A-1 helicopters.[13] Butler asserted that in the 1996 bulletin, Bell again deceived the FAA by concealing significant information and falsely representing that the probability of

---

[12]Boocock opined Bell should have considered the five military failures, which it knew were likely caused by static overload which occurs both in military and civil use, and should have recalled all the yokes for X-ray diffraction testing, which Bell knew could determine the peak compressive strain to which a particular yoke had been subjected.

[13]The 1996 bulletin, which constituted a revision to the helicopter's maintenance manual, stated Bell had determined that the yoke was susceptible to static overload "if it is loaded by external bending forces," such as high-wind gusts, improper ground handling, and so on. The bulletin stated that, if undamaged, the tail rotor yoke flexure was reliable for its full retirement life. In the bulletin, Bell required (a) immediate review of all yoke assembly

catastrophic in-service fatigue failure was extremely remote. Based on the failures of the yokes on military aircraft and the 1992 military study, Boocock opined, among other things, that (a) in 1996, Bell knew the only reliable method of determining loss of residual compressive stress was by X-ray diffraction testing; and (b) it was likely the accident would not have happened if Bell had not increased the service life to 5,000 hours and had adequately determined the fatigue life of the yoke on a firefighting helicopter, or if Bell had required X-ray diffraction testing to directly determine the loss of residual compressive stress. Butler's other experts also stated the dimensional testing specified in the 1996 bulletin could not reliably measure the slight, minimally detectible bending that would indicate a yoke had been yielded. Butler contended this point was confirmed by the fact that the crash occurred after dimensional testing of the accident yoke took place. Moreover, after the accident the 1996 bulletin was revised, on May 18, 1998, to require one-time X-ray diffraction testing of the yokes.[14]

### 3. *Bell's reply to Butler's evidence.*

In reply to Butler's opposition, Bell submitted a declaration from Henry A. Armstrong, a recently retired 20-year employee of the FAA responsible for certification of civil aircraft. Armstrong opined that part 21.3 of the FAA's regulations does not require reporting of failures of aircraft parts in military applications, explaining that military aircraft are not certified by the

---

historical records, and immediate replacement or inspection of any yoke which was previously involved in any incidents which could have induced a bending load into the yoke; (b) a dimensional inspection of all yoke assemblies to determine if they had been subjected to excessive bending loads, using a special tool to determine if the yoke had yielded; (c) installation of a new type of trunnion assembly with flapping stops on any model 205A-1 helicopter on which it was not already installed, to be used for determining if the yoke assembly may have been exposed to excessive bending loads; (d) a 25-hour recurring inspection of the new trunnion assembly flapping stops, to determine "if damaging/excessive bending loads have been sustained by the tail rotor yoke"; and (e) visual inspection of flapping stops after every occurrence of a sudden stoppage or hard landing.

[14]Butler's other experts opined as follows. Norman L. Horton stated that the 1996 test tool and instructions for its use in dimensional testing were defective, and the failure of the test to detect and eliminate the yoke was a direct cause of the accident. Arun Kumar, who performed nondestructive metallurgical failure analysis of the tail rotor yoke for the NTSB (National Transportation Safety Board) after the accident, explained the cause of the accident, described the military failures from the same cause and the study Bell made of those failures for the Army, and opined there was no rational engineering basis to increase the retirement life of the yoke for civil helicopters. Kumar also opined that the X-ray diffraction testing of the yokes after the accident proved that the dimensional test was unreliable (and that Bell had sufficient background data on the yokes to know that in 1996). Melvin Vague evaluated the tool used to conduct the dimensional testing under Bell's 1996 bulletin and concluded it was defective in design and incapable of providing a reliable indication of loss of residual compressive stress, and that "Bell knew that the tool was likely defective and could not assure the continued safe use of the yoke, and that a better, direct and reliable method was available."

FAA, and manufacturers of those aircraft do not apply for and do not receive an FAA type certificate.[15] Part 21.3 requires reporting "only by type certificate holders," and the "FAA does not require Bell to report failures on anything that they do not hold a type certificate for." Armstrong observed that military and civil aircraft sometimes share common parts produced in a common production process, but that military aircraft with such parts frequently differ significantly from the civil aircraft. Military aircraft, he explained, are frequently designed according to different load spectrums, resulting in different operating limitations and different component service lives.

### 4. *The trial court's order.*

The trial court granted Bell's motion for summary judgment. The court concluded military aircraft failures are not subject to the mandatory reporting requirements of FAR part 21.3, and Bell's failure to report them to the FAA did not establish the fraud exception to the statute of repose. The court observed Butler had cited no regulation expressly requiring such reporting and presented no evidence that military failures were in practice reported to the FAA. The court also rejected Butler's claim that Bell violated part 29.571 by representing the probability of catastrophic in-service failure of the tail rotor yokes was extremely remote, since that claim too was founded upon the irrelevant nondisclosure of military failures.[16]

Judgment was entered in Bell's favor on July 12, 2001, and this appeal followed.

### DISCUSSION

■ We conclude that the facts proffered by Butler support the applicability of the fraud exception to the statute of repose, and therefore reverse

---

[15]A "type certificate" is issued by the FAA and certifies that the type design for a particular aircraft model or models, with operating limitations and conditions specified in Civil Air Regulations and a data sheet attached to the certificate, meets the airworthiness requirements of those regulations. The type certificate authorizes the manufacturer to build the model specified; once it is built and tested, it is presented to FAA-authorized individuals to issue an airworthiness certificate, which means the helicopter is safe to fly. (See *Crane Helicopter Services, Inc. v. United States* (Fed.Cl. 1999) 45 Fed.Cl. 410, 415 [trial court].)

[16]The court also rejected the contention that BTSI and Gustafson were not manufacturers, and therefore not entitled to the benefit of the statute of repose, concluding their acts were performed as agents for Bell and constituted performance of functions as a manufacturer. Finally, the court rejected Butler's contention that changes in the maintenance manual constituted installation of a "new part" extending the statute of repose, and likewise rejected the contentions that (a) the dimensional inspection tool was a part of the aircraft, and (b) the flapping stops caused the accident. We do not address these aspects of the trial court's decision.

the judgment of the trial court. Specifically, we hold that under part 21.3(a) of the FAA's regulations, Bell had an affirmative duty to report the failures that occurred in identical tail rotor yokes installed on military aircraft, referred to by the parties as "dual use" parts. The withholding of that information brings these lawsuits within the statutory exception applicable when a manufacturer has "knowingly misrepresented to the [FAA], or concealed or withheld from the [FAA], required information" material to the maintenance or operation of the aircraft or part that is causally related to the harm. (GARA, § 2(b)(1).)

Our conclusion is required by the plain meaning of FAR part 21.3, and is the only interpretation consistent with the FAA's statutory responsibility to promote the safe flight of civil aircraft. Contrary to the trial court's conclusion, interpreting part 21.3 in accordance with its plain meaning in no way expands the scope of the FAA's jurisdiction. In addition, there is no merit in Bell's contention that summary judgment was proper based on the absence of a causal relationship between Bell's failure to report the military accidents and this accident. We treat each of these points in turn.

1. *Bell had an affirmative duty to report the military failures in the tail rotor yoke under the plain language of FAR part 21.3.*

Butler contends, and we agree, that the plain language of part 21.3 of the FAA's regulations required Bell to report the five military accidents to the FAA, once Bell had determined those accidents were caused by failures in a critical aircraft part—the yoke identical to those installed on Bell's type-certificated model 205A-1 helicopter.[17] Part 21.3 provides: "[T]he holder of a Type Certificate . . . shall report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section." (14 C.F.R. § 21.3(a) (2003).) Paragraph (c) lists a "rotorcraft hub or blade structural failure" (14 C.F.R. § 21.3(c)(5)), which includes the tail rotor yoke.

---

[17] The parties agree that, under the fraud exemption to the statute of repose, "required information" means the manufacturer had an affirmative duty to report the information at issue under a statute, regulation or case, or in response to a direct inquiry from the FAA, or to correct information previously supplied directly by the manufacturer to the FAA. Both Butler and Bell cite *Cartman v. Textron Lycoming Reciprocating Engine Division* (E.D.Mich. Feb. 27, 1996) 1996 U.S. Dist. Lexis 20189, p. 11 ("[g]iven . . . the narrow wording of the provision, the Court is unwilling to infer a duty under § 2(b)(1) requiring defendants to volunteer information which is (1) not required by statute or regulation, (2) not in response to a direct inquiry by the FAA, or (3) not necessary in order to correct information previously supplied directly by the defendant to the FAA"). *Cartman* is an unpublished opinion, but we see no basis for disagreement with its analysis.

On its face, FAR part 21.3 applies. Bell was "the holder of a Type Certificate" for the model 205A-1 helicopter. Bell manufactured the tail rotor yoke that caused the military accidents, using it in both the type-certificated model 205A-1 and several military models. Part 21.3 says Bell is required to report "any failure . . . in any product, part, process or article manufactured by it" that it determines has resulted in the listed occurrences. Those occurrences include tail rotor yoke failure. Bell determined in 1989 that in-flight fatigue failure of the yoke it manufactured caused the military aircraft accidents. Consequently, Bell's obligation to report those failures is patent. The regulation contains no exceptions.

Accordingly, nothing in the plain language of the regulation excuses Bell from reporting the failure of a dual use tail rotor yoke merely because it is installed on a military helicopter. Moreover, even if FAR part 21.3 were less clear, we would be required to interpret it in consonance with the statutory charge given to the agency which issued it. The FAA's *raison d'être* is to "promote safe flight of civil aircraft" (49 U.S.C. § 44701(a)); when issuing certificates, the FAA is obliged to consider an air carrier's duty to provide service "with the highest possible degree of safety in the public interest . . . ." (*Id.*, § 44702(b)(1)(A).) Indeed, as one court observed more than thirty years ago, the requirement of safety "permeates the whole [Federal Aviation] Act." (*Gabel v. Hughes Air Corp.* (C.D.Cal. 1972) 350 F.Supp. 612, 616.) We find it inconceivable that an agency charged with the safe flight of civil aircraft would or could forswear the receipt of information so patently relevant to its statutory responsibilities, simply because the defective part was installed on a military rather than a type-certificated aircraft. Such an interpretation does not make "abundant good sense" as Bell claims; it makes no sense at all in light of the FAA's regulatory obligations.[18]

 Bell nonetheless argues, despite the clarity of the regulatory language, that FAR part 21.3 is directed only at failures on civil, type-certificated aircraft. We discuss that contention next.

---

[18]One other observation may be in order. FAR part 21.3 is broadly drafted, and a literal construction of its words would mean that a manufacturer must report any failure in any military aircraft or component manufactured by it, regardless of whether a dual-use part was involved. Bell does not raise this point, nor is it raised by the facts of this case, and accordingly we need not consider it. We note, however, that statutory interpretations that "defy common sense, or lead to mischief or absurdity, are to be avoided." (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]; see *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299] ["the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose"].)

*2. There is no merit in Bell's contention that the reporting requirement of FAR part 21.3 is directed only at failures on type-certificated aircraft.*

Bell argues, and the trial court agreed, that military yoke failures are not required to be reported to the FAA under FAR part 21.3, because the regulation "clearly is directed to the 'holder of a Type Certificate,' " and military aircraft are not type-certificated aircraft. This interpretation is sensible, Bell contends, because the significant differences between civil and military aircraft mean that problems which surface in one application will not inevitably occur in the other. Moreover, Bell points out, military helicopters are built to specifications and requirements of the armed forces, which establishes the standards and procedures for maintaining the airworthiness of its aircraft, over which the FAA has no authority. Similarly, the trial court appeared to conclude that interpreting part 21.3 as meaning what it says would result in "having expanded the scope of the [FAA's] jurisdiction."[19]

Bell's argument is fundamentally flawed. First, Bell points to no basis upon which we might find the words of the regulation ambiguous. ▮ Well-settled principles of statutory construction tell us that when language is clear and unambiguous, " ' "there is no need for construction and courts should not indulge in it." ' . . ." (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268 [121 Cal.Rptr.2d 203, 47 P.3d 1069], citations omitted.) ▮ More significantly, however, Bell's argument and the trial court's conclusion are based on an entirely false premise, namely, that the reporting of military accidents determined to have been caused by an aircraft part used in both civil and military aircraft would somehow expand the FAA's jurisdiction. That premise is patently erroneous.

Certainly, FAR part 21.3 is directed to the holders of type certificates for civil aircraft, and it is only those aircraft and those manufacturers over which the FAA has jurisdiction. However, the requirement to report a failure or malfunction in an aircraft part, whether the part is installed on a type-certificated or military aircraft, has nothing to do with the FAA's jurisdiction, and most assuredly does not expand it. The FAA's responsibility to promote the safety of civil aircraft flight necessarily gives it the authority to require a civil aircraft manufacturer to file reports on any matter that is clearly relevant to the safety of a type-certificated aircraft. That is all part

---

[19]The trial court concluded that the argument that the plain meaning of FAR part 21.3 covers "any failure" was "not persuasive against the apparent actual practice of the FAA and the manufacturers. An agency's rules and regulations must be read in the context of the agency's jurisdiction. The 'plain meaning' guideline should not be followed so as to interpret a rule as having expanded the scope of the issuing agency's jurisdiction."

21.3 does. The requirement to report a military failure under the circumstances specified in part 21.3 requires no action by the military. It in no way interferes with military decisions on the airworthiness of military aircraft or their components. It merely requires Bell, after it has determined that a military accident was actually caused by a part also in use on its type-. certificated aircraft, to report that occurrence to the FAA.[20] Nothing in that requirement expands or purports to expand the FAA's jurisdiction.

Bell insists that substantial differences exist between civil and military aircraft, and problems which surface in military aircraft will not inevitably occur in civil aircraft. There may indeed be instances where the information reported to the FAA about a defective part in a military aircraft does not have equal significance to the performance of that part in a civil aircraft.[21] That, however, is for the FAA to decide. Irrelevant information may be discarded, but the FAA cannot fulfill its obligation to promote civil aircraft safety if information which may be highly relevant to safety is withheld in the first instance. In short, the FAA's decision whether to act on a particular report submitted to it has no bearing on whether a report is required, nor should it.[22]

In sum, our interpretation of FAR part 21.3, consonant with its plain meaning and with the FAA's statutory role in the safety of civil aircraft, does not expand the scope of the FAA's jurisdiction. The regulation merely requires a manufacturer to report "any failure, malfunction, or defect" in a part manufactured by it, when the manufacturer has determined the defect

---

[20]The trial court found "noteworthy" the fact that plaintiff cited no evidence that military failures are in fact reported to the FAA, and referred to the "apparent actual practice of the FAA and the manufacturers" not to do so. As Bell itself points out, the court's statement about the "apparent actual practice" was presumably based only on Bell's position it was not required to report military failures and the absence of evidence other manufacturers did so. We reject the implication that Butler was required, or in a position, to prove that other manufacturers in fact complied with their responsibility to report military failures of dual use parts as required; proof of what other manufacturers may have done in comparable situations is irrelevant to the question whether reporting is legally required.

[21]This, however, is not such a case. Butler presented evidence that Bell knew that the military crashes were caused, not by the different and greater stresses to which military aircraft are subjected, but by static overload occurring when the tail rotor is stationary—in short, circumstances as likely to occur in civil as in military use.

[22]Bell also argues, as an "entirely independent basis as to why the military accidents were non-reportable," that the incidents were determined to have been caused by static damage to the yokes. FAR part 21.3(d), Bell points out, exempts reporting of incidents "caused by improper maintenance, or improper usage . . . ." (14 C.F.R. § 21.3(d)(1)(i) (2003).) The argument does not assist Bell here, because (a) static damage is not always caused by improper maintenance or usage, and (b) Bell offered no evidence on the point. Bell of course is at liberty to present evidence to the trial court that all five military yoke failures were determined to have been caused by improper maintenance or usage and were therefore not reportable, but that is a matter for another day.

has resulted in one of the occurrences listed in the regulation. We discern no reason in law or public policy to exclude from this reporting requirement a failure in a critical part used on a manufacturer's type-certificated aircraft, simply because the failure occurred on a military aircraft.[23]

### 3. Bell is not entitled to summary judgment based on the alleged lack of causal relationship between its failure to report the military accidents and the occurrence of this accident.

Bell also argues there is no causal relationship between its failure to report the military accidents and this accident.[24] Bell points out that in 1996, two years before the accident, it fully informed the FAA, as well as helicopter operators, of the need to inspect and immediately replace any tail rotor yoke that had been damaged by static overload. Therefore, Bell contends, its failure to report the incidents involving military aircraft cannot be deemed causally related to the 1998 crash.

The argument has no merit. If the FAA had been aware of five catastrophic yoke failures in 1989, when Bell increased the retirement life of the yoke to 5,000 hours, the FAA may have been inclined to question the increase, or require further evaluation, or require X-ray diffraction testing (the last of which the FAA did require after this accident occurred). We cannot conclude, on this record, what the FAA would have done, and we certainly cannot conclude as a matter of law there was no relationship between the withheld information and the accident. (See Steggerda, *GARA's Achilles: The Problematic Application of the Knowing Misrepresentation Exception* (1997) 24 Transp. L.J. 191, 217 ["the FAA cannot ask for more extensive examinations of a problem that it does not know exists because a manufacturer withheld or concealed the required information. . . . The FAA may well have required . . . flight tests into actual icing conditions had the manufacturer accurately and timely reported the known defect"].) In

---

[23]Butler also argues that the fraud exception to the statute of repose applies because Bell misrepresented or concealed information required under FAR part 29.571, in connection with the changes Bell made to the helicopter's maintenance manual in 1989 (increasing the retirement life of the yoke) and in 1996 (requiring dimensional testing of the yoke). In view of our holding that Bell was required to report the military yoke failures to the FAA under part 21.3, we need not consider Butler's additional claim that misrepresentations were made under part 29.571.

[24]Under the fraud exception to the statute of repose, Butler must prove Bell withheld required information "that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is causally related to the harm which the claimant allegedly suffered . . . ." (GARA, § 2(b)(1).)

short, causation issues—on which Bell presented no evidence in its summary judgment motion—are matters for resolution by the trier of fact.[25]

CONCLUSION

We discern no basis in the language of FAR part 21.3, or in sound public policy, for excusing Bell from reporting the catastrophic in-flight failures of a yoke it manufactures and installs on both civil and military helicopters. Once Bell actually determined the yoke it manufactured and installed on both type-certificated and military aircraft was the cause of an accident, it was obligated under part 21.3 to report the yoke failure to the FAA. Part 21.3(e)(1) requires such reporting within 24 hours of the manufacturer's determination.[26] Butler presented uncontradicted evidence Bell knew of the military failures, but did not report them. Accordingly, since Butler established that Bell withheld required information from the FAA, summary judgment based on the GARA statute of repose was improper.

DISPOSITION

The judgment is reversed and the cause is remanded with directions to the trial court to vacate its order granting Bell's motion for summary judgment and to enter a new order denying the motion. Maria Butler and the other appellants are to recover their costs on appeal.

Cooper, P. J., and Rubin, J., concurred.

Respondents' petition for review by the Supreme Court was denied September 10, 2003.

---

[25]We also note that the fraud exception requires proof the manufacturer "knowingly misrepresented to the [FAA], or concealed or withheld from the [FAA], required information . . . ." (GARA, § 2(b)(1).) Bell does not contend that the "knowing" requirement for a misrepresentation also applies to a concealment or withholding of required information, nor could Bell successfully do so. The grammatical structure of the fraud exception suggests no such requirement, and in any event Bell is presumed to know the law. (See, e.g., *Anderson v. Superior Court* (1995) 11 Cal.4th 1152, 1161 [48 Cal.Rptr.2d 766, 907 P.2d 1312]; see also Hedrick, *A Close and Critical Analysis of the New General Aviation Revitalization Act* (1996) 62 J. Air L. & Com. 385, 411 ["under GARA, the 'knowledge' requirement only applies to misrepresentation, not to the concealment or withholding of information"].)

[26]Part 21.3(e) provides that the report of such failures "[s]hall be made to the Aircraft Certification Office in the region in which the person required to make the report is located within 24 hours after it has determined that the failure, malfunction, or defect required to be reported has occurred." (14 C.F.R. § 21.3(e)(1) (2003).) In the absence of a report at the time Bell discovered that the five military crashes were caused by yoke failures, Bell's increase in the retirement life of the yoke from 4,000 to 5,000 hours should certainly have precipitated such a report, since Bell was required to show that the probability of catastrophic fatigue failure was "extremely remote" within the 5,000-hour replacement time.