[No. 83030-4.   En Banc.]
Argued June 8, 2010.    Decided April 7, 2011.

KENNETH C. BURTON, *as Personal Representative and on Behalf of Several Claimants, Respondent*, v. TWIN COMMANDER AIRCRAFT, LLC, *Petitioner*.

206

*Clark R. Nichols, Mary P. Gaston, Rebecca S. Engrav*, and *Paul S. Graves* (of *Perkins Coie LLP*), for petitioner.

*Kerry V. Kovarik, Thomas W. Bingham*, and *Jeffrey C. Jones* (of *Krutch, Lindell, Bingham, Jones & Petrie PS*) (*Gene Hagood* of *Hagood & Neumann LLP*, of counsel), for respondent.

¶1 MADSEN, C.J. — This action arises out of an airplane crash near Aguascalientes, Mexico, in which seven people died. The personal representative of the decedents' estates brought wrongful death actions against Twin Commander Aircraft LLC. The trial court granted summary judgment in favor of Twin Commander on the ground that the statute of repose set forth in the General Aviation Revitalization Act of 1994 (GARA)[1] bars the actions. The Court of Appeals reversed.

¶2 GARA's statute of repose bars a suit against a manufacturer of general aviation aircraft if the accident occurred 18 years or more after delivery of the aircraft to its first purchaser. Twin Commander, as a type certificate holder (explained below), is a "manufacturer" within the contemplation of GARA as a matter of law. Twin Commander is therefore entitled to GARA's statute of repose, since the plane crash in this case occurred more than 18 years after delivery of the aircraft to the first purchaser, unless an exception to the statutory bar applies.

¶3 The personal representative of the decedents' estates relies on the "fraud exception" to GARA's statute of repose. However, to obtain the benefit of this exception, a claimant must plead and prove with specificity facts that establish that the defendant manufacturer knowingly misrepresented, concealed, or withheld from the Federal Aviation Administration (FAA) information that must be reported that is "material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is causally related to the [claimant's alleged] harm." GARA § 2(b)(1). Critically, knowledge as a state of mind applies to each of these forms of keeping information from the FAA; that is, "knowingly" modifies each of the words "misrepresented," "concealed," and "withheld" in the exception.

¶4 There is no genuine issue of material fact as to whether Twin Commander knowingly withheld informa-

---

[1] Pub. L. No. 103-298, 108 Stat. 1552 (1994), as amended by Pub. L. No. 105-102, § 3(e), 111 Stat. 2204, 2215-16 (1997) (codified at 49 U.S.C. § 40101 note).

tion from the FAA that it was required to report. The claim that the "fraud exception" applies rests on the contention that Twin Commander was required to reevaluate a 1992 accident that had already been reported and thoroughly investigated by the National Transportation Safety Board (NTSB), conclude that the earlier accident involved the same problem that led to other aircraft accidents in 2002 and 2003 (although the board's conclusion about the cause of the crash was otherwise), and connect the earlier accident to the later accidents in reports to the FAA.

¶5 It is doubtful that the personal representative has produced sufficient evidence to show that information required to be reported was misrepresented, concealed, or withheld, but we base our decision on other grounds, i.e., the dispositive matter is that the personal representative has produced no facts that could establish the requisite "knowing" state of mind. Although he relies almost exclusively on two e-mails sent by a Twin Commander officer describing the accidents, there is nothing in these e-mails that raises a question of material fact as to whether Twin Commander officials knowingly misrepresented or withheld information from the FAA. Indeed, there is nothing in the e-mails that even suggests such knowledge, a burden that the statute places on the plaintiff to establish.

¶6 Absent evidence on this necessary element of the "fraud exception," there is no material fact issue as to whether the exception applies. This being the case, GARA's statute of repose bars this action.

¶7 We conclude that the trial court properly granted summary judgment in favor of Twin Commander and accordingly reverse the Court of Appeals and reinstate the summary judgment.

## FACTS

¶8 Rockwell International introduced the Twin Commander 690 series aircraft in 1971. In 1979, the FAA issued a type certificate that authorized Rockwell to manufacture

the type of aircraft at issue, a 690C dual engine turbo prop airplane. A type certificate is issued when the FAA has found that the aircraft is properly designed and manufactured and meets minimum federal safety standards and regulations. 49 U.S.C. § 44704(a)(1). Once a type certificate is issued, the holder of the certificate may seek a production certificate authorizing the holder to manufacture the aircraft. 49 U.S.C. § 44704(c). The holder of the type certificate has exclusive manufacturing authority. 49 U.S.C. § 44704(a)(3).[2] Type certificates are transferable. 14 C.F.R. § 21.47.

¶9 In 1981, Gulfstream American Corporation acquired Rockwell. Gulfstream built the particular airplane that crashed near Aguascalientes, Mexico, in 2004. The aircraft was sold and delivered to its first purchaser in 1981.

¶10 In 1989, Gulfstream was sold, and Twin Commander acquired the 690-series type certificates but did not continue manufacturing the aircraft. However, as the type certificate holder, Twin Commander is required to provide support for the 690-series aircraft. As the type certificate holder, Twin Commander must report information to the FAA about any failure, malfunction, or defect of any part of the aircraft posing a risk to flight safety, including exhaust system failure; accumulation of toxic or noxious gases; propeller system failure or malfunction; flammable fluid leakage in an ignition area; brake system failure; primary structural defect or failure; abnormal vibration or buffeting; engine failure; malfunction, defect, or failure causing interference with normal control of the aircraft; loss of electrical or hydraulic power systems; and failure or malfunction of more than one attitude, airspeed, or altitude instrument. 14 C.F.R. § 21.3; *see* 14 C.F.R. § 21.7. Also, as a type certificate holder Twin Commander has the obligation to submit design changes if the FAA issues an airworthiness directive that makes such changes necessary, 14 C.F.R. § 21.99, and prepare instructions for continued airworthiness that meet FAA approval, 14 C.F.R. § 25.1529.

---

[2] The type certificate holder can manufacture the aircraft and can authorize a third party to manufacture the aircraft.

¶11 In April 2003, after two model 690B aircraft had crashed in 2002 and 2003, Twin Commander issued Alert Service Bulletin 235 (service bulletin 235), titled "Upper Rudder Structural Inspection," advising the operators of several aircraft models, including the 690-series, to inspect the rudder cap for unusual wear, which could result in the rudder cap separating from the aircraft. Service bulletin 235 required a one-time inspection of the rudder cap, top rudder rib, and forward rudder spar. The bulletin described the reason for the bulletin as being the accidents that occurred in 2002 and 2003.

¶12 In May 2004, the crash in Mexico occurred. The model 690C aircraft was at that time owned by Mexico's Procuradia General de la Republica. Seven government agents were on board; all were killed in the accident. An investigation by the Mexican government reached the conclusion that the rudder came loose during flight, causing the accident. A report by Mexican authorities states that in July and October 2003 the aircraft had been inspected in accord with service bulletin 235.

¶13 On April 29, 2005, Mr. Kenneth C. Burton, personal representative of the decedents' estates, filed wrongful death actions against Twin Commander in King County Superior Court, alleging that service bulletin 235 was a defective product that caused the crash and asserting causes of action for product liability, negligence, failure to disclose to/concealment of information from the FAA, and strict products liability. The plaintiff's amended complaint expressly limits all of these claims "solely and only to Service Bulletin 235." Clerk's Papers (CP) at 221.

¶14 Twin Commander moved for summary judgment on the basis of GARA. GARA bars actions against the manufacturers of general aviation aircraft[3] if the accident occurred 18 years after delivery of the aircraft to the first

---

[3] A "general aviation aircraft" is an aircraft for which the FAA has issued a type certificate or an airworthiness certificate, which at the time the certificate was issued seated fewer than 20 passengers, and which at the time of the accident was not engaged in scheduled passenger-carrying operations. GARA § 2(c).

purchaser. Pub. L. No. 103-298, § 2(a), 108 Stat. 1552 (1994), as amended by Pub. L. No. 105-102, § 3(e), 111 Stat. 2204, 2215-16 (1997) (codified at 49 U.S.C. § 40101 note). This statute of repose preempts state law to the contrary. *Id.* § 2(b)(1). Here, the aircraft was delivered to the first purchaser in 1981, well over 18 years before the accident.

¶15 The trial court granted Twin Commander's motion for summary judgment, holding that Twin Commander was a "manufacturer" entitled to the benefit of the statute of repose and that service bulletin 235 did not restart the 18-year period under a "rolling" feature of GARA. Mr. Burton appealed and the Court of Appeals reversed. *Burton v. Twin Commander Aircraft, LLC*, 148 Wn. App. 606, 221 P.3d 290 (2009). The Court of Appeals held that whether Twin Commander is a "manufacturer" for purposes of GARA is a material question of fact, that the "rolling" provision did not apply to restart the 18-year period, and that there is a question of material fact as to whether Twin Commander misled the FAA when reporting the rudder problem and therefore as to whether Twin Commander is entitled to the benefit of the statute of repose. *See* GARA § 2(b)(1).

¶16 We granted Twin Commander's petition for discretionary review.[4]

## DISCUSSION

■ ¶17 The question we must answer is whether Mr. Burton is barred from bringing this suit based on GARA's statute of repose. Because this matter is here on a grant of summary judgment, our review is de novo. *Braaten v. Saberhagen Holdings*, 165 Wn.2d 373, 383, 198 P.3d 493 (2008). Summary judgment is appropriate where there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The evidence and inferences from the evidence are construed in favor of the nonmoving party. *Braaten*, 165 Wn.2d at 383.

---

[4] We denied review of issues raised by Mr. Burton, i.e., whether service bulletin 235 constituted a new component that acted to restart the 18-year repose period and issues about alleged misrepresentations during original type certification.

■ ¶18 GARA is a statute of repose that limits liability to 18 years after an aircraft is delivered. GARA §§ 2(a), 3(3). It was enacted to address "enormous product liability costs" the tort system had led to in the general aviation industry, *Lyon v. Agusta, SPA*, 252 F.3d 1078, 1084 (9th Cir. 2001), that led to "a serious decline in the manufacture and sale of general aviation aircraft by United States companies." H.R. REP. No. 103-525, pt. 1, at 1 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 1638, 1639 (hereafter H.R. REP. 103-525). This decline involved loss of aircraft production, loss of jobs, and worsening of the United States' position in international trade because foreign manufacturers were not subject to the same liability costs. H.R. REP. 103-525, pt. 1, at 1-2. The law was intended to "strike a fair balance between manufacturers, consumers, and persons injured in aircraft accidents." *Id.* at 2. Congress relied on studies that had shown that nearly all defects are discovered early in the life of an aircraft and only a small percentage of accidents are caused by a design or manufacturing defect. *Id.* at 3, 6. But suits were frequently filed because manufacturers would settle to avoid the expense of litigation. Adding to the problem was the fact that as an aircraft aged, it was likely to have had several owners, gone through modifications, and had major maintenance problems—all making it more difficult to determine whether the manufacturer or some other person was responsible for a defect. *Id.* at 3.[5]

---

[5] In further detail, the legislative report states:

It is extremely unlikely that there will be a valid basis for a suit against the manufacturer of an aircraft that is more than 18 years old. Nearly all defects are discovered during the early years of an aircraft's life. Aircraft design and manufacture are regulated by FAA, [and these] regulatory powers have generally insured safety; NTSB data shows that only 1% of general aviation accidents are caused by design or manufacturing defects.

However, . . . suits are frequently filed [because] the manufacturers will settle to avoid the expense of litigation.

Manufacturers incur substantial expense from these cases. Beech Aircraft testified that the average cost of litigation was $500,000 per case, even though Beech was generally successful in defending the case.

Another element of fairness in the reported bill is that the statute of repose in the bill is "rolling." . . . [W]hen a part in an aircraft is replaced with a new part, a new 18 year period begins for that part. In addition, . . . the statute of

¶19 Accordingly, Congress enacted GARA to limit the "long tail of liability" imposed on general aviation aircraft manufacturers. *Lyon*, 252 F.3d at 1084 (citing H.R. REP. 103-525, pt. 1, at 1-4). GARA provides in relevant part:

SEC. 2. TIME LIMITATIONS ON CIVIL ACTIONS AGAINST AIRCRAFT MANUFACTURERS.

(a) IN GENERAL.—Except as provided in subsection (b), no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as a manufacturer if the accident occurred—

(1) after the applicable limitation period beginning on—

(A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or

(B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft . . . .

. . . .

---

repose does not apply if the manufacturer knows of a defect and fails to comply with its obligation to report the defect to FAA.

. . . .

. . . As an aircraft gets older, it is more likely to have had a number of owners and to have gone through modifications and major maintenance procedures. This makes it increasingly difficult to determine whether the manufacturer or some other person who used or repaired the aircraft is primarily responsible for a defect.

. . . .

. . . Freed from excessive liability costs, manufacturers will be able to sell aircraft at lower prices. Relief from most of the "tail" of liability for previously manufactured aircraft will enable the manufacturers to spend more on research and development[, which] will enhance . . . manufacturers' ability to compete with foreign companies.

The expected increase in aircraft sales will lead to an increase in jobs. . . .

In sum, the Committee believes that the standards established by the reported bill will curb excessive liability costs, while at the same time affording fair treatment to persons injured in aircraft accidents.

H.R. REP. 103-525, pt. 1, at 2-3.

SEC. **3.** OTHER DEFINITIONS.

For the purposes of this Act—

. . . .

> (3) the term "limitation period" means 18 years with respect to general aviation aircraft and the components, systems, subassemblies, and other parts of such aircraft . . . .

GARA §§ 2(a), 3(3). As noted, GARA provides a "rolling" statute of repose, extending the 18-year limitation period[6] " 'with respect to any new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage.' " *Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155, 1156 (9th Cir. 2000) (quoting GARA § 2(a)(2)).

¶20 GARA "creates an explicit statutory right not to stand trial." *Estate of Kennedy v. Bell Helicopter Textron, Inc.*, 283 F.3d 1107, 1110 (9th Cir. 2002).

¶21 The first question we must decide is whether Twin Commander is a "manufacturer" within the meaning of GARA. Because it is undisputed that Twin Commander did not actually manufacture the aircraft, the question becomes whether the type certificate holder is a "manufacturer." Twin Commander maintains that since it is a type certificate holder and therefore subject to all of the duties of an original manufacturer, as a matter of law it should be considered a "manufacturer" for purposes of GARA. The Court of Appeals concluded, however, that whether Twin Commander is a "manufacturer" poses a factual question

---

[6] As a statute of repose, GARA's 18-year period does not run from the date of injury, but "from what amounts to the date of the first transfer from the manufacturer." *Lyon*, 252 F.3d at 1084. GARA does not equate to a statute of limitations "because a statute of limitations does not give rise to a right not to stand trial, but rather creates a safeguard against unfair verdicts from delinquent suits." *Estate of Kennedy v. Bell Helicopter Textron, Inc.*, 283 F.3d 1107, 1111 (9th Cir. 2002). GARA, as a statute of repose, " 'proceeds on the basis that it is unfair to make somebody defend an action long after something was done or some product was sold. It declares that nobody should be liable at all after a certain amount of time has passed.' " *Id.* (quoting *Lyon*, 252 F.3d at 1086).

because Twin Commander had not established that it was a successor manufacturer that had assumed the assets and liabilities of the original manufacturer, Gulfstream.

¶22 We agree with Twin Commander that the meaning of "manufacturer" for purposes of the act is a question of law. Statutory interpretation is a question of law for the court, which is reviewed de novo. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). In *Pridgen v. Parker Hannifin Corp.*, 588 Pa. 405, 421-22, 905 A.2d 422 (2006), *adhered to on reargument*, 591 Pa. 305, 916 A.2d 619 (2007), the court recognized that the meaning of "manufacturer" is a question of law. The court in *Burroughs v. Precision Airmotive Corp.*, 78 Cal. App. 4th 681, 688, 93 Cal. Rptr. 2d 124 (2000), similarly recognized that construction of GARA is a question of law, reviewed de novo.

¶23 Our primary goal is to ascertain and give effect to legislative intent—here congressional intent. *Id.* The term "manufacturer" is not defined in GARA. However, we are not the first to face this question. Several courts have examined congressional intent in enacting GARA to determine whether an entity is entitled to the protection afforded by GARA by virtue of having become the type certificate holder. In *Burroughs*, the court explained the legislative history, concluding that it "indicates that it was passed in response to a serious and 'precipitous' decline in the manufacture and sale of general aviation aircraft by United States companies, caused in part by the tremendous increase in the industry's liability insurance." *Id.* at 690. The court noted that GARA is intended " 'to limit excessive product liability costs, while at the same time affording fair treatment to persons injured in general aviation aircraft accidents.' " *Id.* (quoting H.R. REP. 103-525, pt. 1). Congress believed that relief from the "long 'tail' " of liability "would revitalize the industry and result in an increase in jobs, enable manufacturers to spend more on research and development, and enhance manufacturers' ability to compete with foreign companies." *Id.* at 691; *see also Pridgen*,

588 Pa. at 422 ("it seems clear under the terms of GARA, as well as from its developed legislative history, that Congress was concerned with exposure of covered aviation manufacturers to both liability in damages and associated litigation costs").

¶24 The court in *Burroughs* concluded that to the extent that GARA applies to shield the original manufacturer of a product, "a successor manufacturer who has taken over the duties and obligations of the original manufacturer as to that product is also protected from liability for such claims." *Burroughs*, 78 Cal. App. 4th at 692. In *Burroughs*, an airline parts manufacturer, Precision Airmotive Corporation, purchased a product line of carburetors and stepped into the shoes of previous companies acting as "Original Equipment Manufacturers," who themselves had stepped into the shoes of the original manufacturer. Precision thus became the holder of a parts manufacturer approval (PMA). *Id.* at 693.

¶25 Although the responsibilities of a PMA holder are not identical to those of a type certificate holder, they are analogous. For example, as a holder of a PMA, and like a type certificate holder, Precision was subject to the requirement that it report information to the FAA about any failure, malfunction, or defect of any part of the aircraft posing a risk to flight safety. *Id.* (citing 14 C.F.R. § 21.3). Also similar to a type certificate holder, "[a]pplicable regulations regarding maintenance, preventive maintenance, and alterations of aircraft provide[d] that the manufacturer's instructions for continued airworthiness are to be followed as contained in the maintenance manuals, service bulletins, service letters and service instructions." *Id.* (citing 14 C.F.R. § 91.403(c)). The California court determined that because Precision "became the entity responsible for . . . fulfilling *the manufacturer's* obligations for continued airworthiness," and was, in the eyes of the FAA, the new manufacturer of the carburetors manufactured by its predecessor, it was entitled to GARA's protection to the extent Precision "assumed and carried out the duties" of the previous manufacturers. *Id.* at 693, 694.

¶26 A type certificate holder, like the PMA holder in
*Burroughs*, assumes the obligations of a manufacturer and
is entitled to the same protection of the statute of repose.
We join the growing majority of courts addressing this issue
and hold that a type certificate holder is a "manufacturer"
for purposes of GARA's statute of repose. *See, e.g., S. Side
Trust & Sav. Bank of Peoria v. Mitsubishi Heavy Indus.,
Ltd.*, 401 Ill. App. 3d 424, 452-55, 927 N.E.2d 179, 339 Ill.
Dec. 638 (2010) (company as independent contractor taking
on manufacturer's duties under type certificates stepped
into shoes of the original manufacturer and is entitled to
protection that would have been afforded to original manu-
facturer under GARA); *Mason v. Schweizer Aircraft Corp.*,
653 N.W.2d 543, 548-49 (Iowa 2002) (finding company was
a "manufacturer" within the meaning of GARA; "it would be
contrary to Congress's purpose to deny the protection of
GARA to a manufacturer who steps into the shoes of the
original manufacturer by acquiring the type certificate");
*Pridgen*, 588 Pa. at 425 (stating, with respect to type
certification, that "[s]ince assumption of the duties and
responsibilities arising out of this process are essential to
manufacturing, claims arising from alleged breaches of
such duties and responsibilities logically must be consid-
ered to be asserted against the manufacturer 'in its capacity
as manufacturer' under GARA, and therefore, subject to its
repose provisions").

¶27 The Court of Appeals, however, believed that
*Burroughs* and *Mason*, both cited by Twin Commander, are
unhelpful because in both cases the type certificate holder
was a manufacturer of aircraft parts, though not of the
specific product line claimed to have caused injury. How-
ever, in neither case was this the basis for the court's
holding that GARA applies. Rather, it was the assumption
of the legal responsibilities of the manufacturer that com-
pelled the courts to conclude that GARA applied in each
case.

¶28 As holder of the type certificate, Twin Commander
has exclusive authority to manufacture the aircraft and is

the only entity required to report failures, defects, and malfunctions. A decision that a type certificate holder like Twin Commander is not afforded protection of GARA would serve as a disincentive to holding type certificates for aircraft and components that are no longer manufactured. The unfortunate consequence of such a decision could well be a shrinking number of entities reporting safety risks and updating airworthiness instructions.

¶29 Finally, we note that Mr. Burton's claim that Twin Commander is not a manufacturer entitled to the statute of repose fundamentally conflicts with its assertion of products liability claims against Twin Commander in its capacity as a manufacturer. GARA states that "no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer . . . *in its capacity as a manufacturer.*" GARA § 2(a). Burton is suing Twin Commander on the basis of alleged failures in connection with service bulletin 235. Like other courts, we fail to see how the act could be construed to permit suit against Twin Commander in its capacity as a manufacturer based on alleged failures in connection with service bulletin 235 if a type certificate holder bearing a manufacturer's responsibilities of reporting and alerting others to safety risks, such as issuing alerts like service bulletin 235, is not considered to be a manufacturer under the act.

¶30 The second issue that we must address is whether there is a material question of fact relating to whether Twin Commander misled the FAA about the rudder problem. Under what is known as GARA's "fraud exception," the statute of repose does not apply

> if the *claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer* with respect to a type certificate or airworthiness certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft *knowingly misrepresented to the Federal Aviation Administration, or*

*concealed or withheld from the Federal Aviation Administration, required information* that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is causally related to the harm which the claimant allegedly suffered.

GARA § 2(b)(1) (emphasis added).

¶31 Although few courts directly address the matter, courts have split on the question of whether "knowingly" modifies only "misrepresented" or whether it also applies to "concealed" and "withheld." *Compare Rickert v. Mitsubishi Heavy Indus., Ltd.*, 923 F. Supp. 1453, 1456 (D. Wyo. 1996) (knowledge is a separate element that must be pleaded and proved with regard to misrepresentation, concealment, or withholding), *with Butler v. Bell Helicopter Textron, Inc.*, 109 Cal. App. 4th 1073, 1088 n.25, 135 Cal. Rptr. 762 (2003) ("knowingly" requirement applies only to misrepresentation).

¶32 Arguably, the structure of the sentence indicates that "knowingly" applies only to "misrepresented." The statute speaks of knowing misrepresentation to the FAA and then of concealment or withholding from the FAA. However, for several reasons we conclude that the exception applies only if the misrepresentation, concealment, or withholding is knowing. First, there is clear indication of congressional intent that the refusal to properly inform the FAA must be knowing, whether it is by misrepresentation, concealment, or withholding. H.R. Rep. 103-525, pt. 1, at 2, describes the provisions in GARA and states that "[t]he statute of repose does not apply if a manufacturer *knowingly withholds* safety information from the FAA." (Emphasis added.)

¶33 Next, the fact that "knowingly" precedes only "misrepresented" is more a semantic distinction than a real one. To "conceal" from the FAA, under common definitions, means "to prevent disclosure or recognition of," "avoid revelation of," "refrain from revealing," and "withhold knowledge of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 469 (2002). To "withhold" from the FAA means "to hold back," "to desist or

refrain from granting, giving, or allowing," and to "keep in one's possession or control." *Id.* at 2627. These definitions suggest that the manufacturer must at the least be aware of the required information and then refuse, decline, or fail to convey it to the FAA. In other words, the terms "conceal" and "withhold" themselves suggest that the material, relevant information must knowingly be kept from the FAA.

¶34 In addition, all of these terms should be considered together. *See In re Det. of Strand,* 167 Wn.2d 180, 188, 217 P.3d 1159 (2009) (single words in statutes should not be read in isolation); *In re Pers. Restraint Petition of Skylstad,* 160 Wn.2d 944, 162 P.3d 413 (2007) (statutory sentences and statute should be read as a whole, without undue focus on a single word in the statute). "Misrepresented," "concealed," and "withheld" together indicate that a mental state is required and that mere negligence, oversight, or inadvertence is insufficient. If that were not true, "knowingly misrepresented" and "concealed" would be superfluous terms, as the term "withheld" could then encompass all acts triggering the exception. We do not construe statutes so as to render language superfluous because we presume that a legislative body will not use superfluous words in a statute. *Rivard v. State,* 168 Wn.2d 775, 783, 231 P.3d 186 (2010); *City of Seattle v. Winebrenner,* 167 Wn.2d 451, 458, 219 P.3d 686 (2009).

¶35 Perhaps most importantly, construing "knowingly" to apply to all of the means by which information may be kept from the FAA best carries out the balance that Congress intended by providing insulation from suit, protecting the general aviation aircraft industry, and protecting public safety while affording fair treatment to people injured in aircraft accidents.

¶36 Additionally, the requirement of knowledge extends to the nature of the information. The reporting requirement applies only to information that is material and relevant to the performance or the maintenance or operation of the

aircraft or a part that is causally related to the harm allegedly suffered. GARA § 2(b)(1). Construing the terms of the exception as a whole, as we must, we take this to mean that Twin Commander would also have had to know that the information was material and relevant. *See One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs., Inc.*, 148 Wn.2d 319, 330, 61 P.3d 1094 (2002) (a court "should interpret the meaning of terms in the context of the statute as a whole and consistently with the intent of the legislature"). If that were not the case, a manufacturer would be not be able, with any degree of confidence, to comply with the reporting requirement.

¶37 Next, Mr. Burton erroneously contends in several places in his briefing that the burden is on Twin Commander to show that it did not knowingly misrepresent information to the FAA. Suppl. Br. of Resp'ts at 2 (Twin Commander "never provided any competent summary judgment evidence conclusively establishing it did not knowingly misrepresent, withhold or conceal 'required information' from the FAA"); Br. of Appellants at 23 (same). However, GARA provides that the claimant must set out the facts that show the exception applies and must do so with specificity. In particular, Mr. Burton has the burden of pleading "with specificity the facts necessary to prove," and the burden to prove a knowing misrepresentation, concealment, or withholding. GARA § 2(b)(1). Accordingly, Mr. Burton must plead and prove facts that would prove the fraud exception. It is not up to Twin Commander to plead and prove that it did comply with the reporting requirements (although nothing bars it from doing so if it chooses).

¶38 Moreover, when a defendant moves for summary judgment and satisfies the initial burden of establishing the absence of a material fact issue,[7] the inquiry shifts to

---

[7] "The moving defendant may meet the initial burden by ' "showing"—that is, pointing out to the [trial] court—that there is an absence of evidence to support the nonmoving party's case.' " *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

the plaintiff. If the plaintiff " ' "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the trial court should grant' " the defendant's motion for summary judgment. *Right-Price Recreation, LLC v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 382, 46 P.3d 789 (2002) (quoting *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))). GARA places on the plaintiff the burden of establishing that GARA's fraud exception applies. Burton has failed to set out facts in his pleadings showing with specificity that the exception applies in accordance with the statutory requirement and has also failed to produce such evidence. Contrary to his contentions, Twin Commander does not bear the burden of showing that it did not knowingly represent information to the FAA.[8]

¶39 Mr. Burton's claim that the "fraud exception" applies boils down to his contention that Twin Commander was

---

[8] The dissent maintains that we mistakenly take into account the burden under GARA to plead and prove with specificity facts necessary to prove the fraud exception. However, we are addressing both summary judgment standards and Burton's contentions that Twin Commander has the burden of disproving knowing misrepresentation. As to the latter, GARA explicitly places the burden on the claimant—here, Burton. As to the former, "[i]n ruling on a motion for summary judgment, a court must apply the standard of proof which will apply at trial." *Gossett v. Farmers Ins. Co. of Wash.*, 133 Wn.2d 954, 973, 948 P.2d 1264 (1997). As the United States Supreme Court explained in a widely and frequently cited opinion, bearing in mind that credibility determinations, weighing of the evidence, and drawing of legitimate inferences are for the trier of fact, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *see also Sedwick v. Gwinn*, 73 Wn. App. 879, 884-85, 873 P.2d 528 (1994) (same; and noting that under Washington's Uniform Fraudulent Transfer Act, chapter 19.40 RCW, actual intent to defraud must be demonstrated by " 'clear and satisfactory proof' " while constructive fraud must be show by " 'substantial evidence' " (quoting *Clearwater v. Skyline Constr. Co.* 67 Wn. App. 305, 321, 835 P.2d 257 (1992))); *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010) (same; and noting that the "naked license" theory of trademark abandonment must meet a "stringent standard of proof"). We must consider that Burton's burden is to plead *and* prove knowing misrepresentation, concealment, or withholding of required information. GARA § 2(b)(1). We appropriately consider this standard when deciding whether summary judgment is appropriate.

required to report, in addition to the information about the 2002 and 2003 accidents, information about a 1992 accident. This argument rests heavily on the opinion of two experts about two e-mails written by a Twin Commander officer.[9] It is highly significant that these e-mails are essentially the *only* evidence that Burton relies on to show knowing misrepresentation, concealment, or withholding of material, relevant information. There is no "smoking gun" and no other evidence of misrepresentation, concealment, or withholding.

¶40 As the record demonstrates, an accident occurred in 1992 involving a Twin Commander model 690C. The accident was investigated by the NTSB, which determined the cause of the accident was turbulence. On November 1, 2002, a model 690B aircraft lost part of its rudder while in midflight. In March 2003, while the NTSB was still involved in investigating the 2002 incident, another model 690B was involved in an accident. The NTSB discovered that some parts of the aircraft had broken off in midflight, including the rudder tip.

¶41 Although Twin Commander had no authority to lead or direct the investigations, as the type certificate holder it could participate in them and observe them. Twin Commander decided to obtain information about the fleet, and in particular the condition of rudders in the field. It sought to find out whether loss of the rudder could have caused the 2003 accident or instead resulted when some other event

---

[9] In his supplemental brief, Mr. Burton addresses earlier accidents, claiming that information about them should also have been reported to the FAA. However, the Court of Appeals rejected Burton's arguments that the failure to conduct certain tests of the model 690C when obtaining certification from the FAA and the failure to investigate previous crashes create material issues of fact. *Burton*, 148 Wn. App. at 627 n.18. The Court of Appeals said there is no dispute that these accidents were reported to the FAA and that disagreements over what tests should have been performed or what caused the crashes do not establish knowing misrepresentation, citing *Rickert*, 923 F. Supp. at 1461; *Burton*, 148 Wn. App. at 627 n.18. We agree with the Court of Appeals' analysis and holding and note additionally that we denied review of issues that Burton raised in this court, which included claims of inadequate testing and insufficient/inaccurate reporting when certification was obtained. Accordingly, we do not consider the earlier incidents.

occurred. As Twin Commander correctly explains, if it determined that there was a problem with the rudders, then it would have to determine if there was a reportable event under 14 C.F.R. § 21.3. Importantly, 14 C.F.R. § 21.3(a), (b), and (d) require reporting by a type certificate holder of failures, malfunctions, or defects in any product manufactured by it "that it determines" has or could result in specified safety risks.[10]

---

[10] 14 C.F.R. § 21.3 provides in part:

**Reporting of failures, malfunctions, and defects.**

(a) Except as provided in paragraph (d) of this section, the holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO [(technical standard order)] authorization, or the licensee of a Type Certificate shall report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section.

(b) The holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type of Certificate shall report any defect in any product, part, or article manufactured by it that has left its quality control system and that it determines could result in any of the occurrences listed in paragraph (c) of this section.

(c) The following occurrences must be reported as provided in paragraphs (a) and (b) of this section:

(1) Fires caused by a system or equipment failure, malfunction, or defect.

(2) An engine exhaust system failure, malfunction, or defect which causes damage to the engine, adjacent aircraft structure, equipment, or components.

(3) The accumulation or circulation of toxic or noxious gases in the crew compartment or passenger cabin.

(4) A malfunction, failure, or defect of a propeller control system.

(5) A propeller or rotorcraft hub or blade structural failure.

(6) Flammable fluid leakage in areas where an ignition source normally exists.

(7) A brake system failure caused by structural or material failure during operation.

(8) A significant aircraft primary structural defect or failure caused by any autogenous condition (fatigue, understrength, corrosion, etc.).

(9) Any abnormal vibration or buffeting caused by a structural or system malfunction, defect, or failure.

(10) An engine failure.

(11) Any structural or flight control system malfunction, defect, or failure which causes an interference with normal control of the aircraft for which derogates the flying qualities.

(12) A complete loss of more than one electrical power generating system or hydraulic power system during a given operation of the aircraft.

(13) A failure or malfunction of more than one attitude, airspeed, or altitude instrument during a given operation of the aircraft.

¶42 This necessarily requires that the manufacturer make a determination of whether the failure, malfunction, or defect has resulted or could result in one of the listed occurrences—a cause and effect analysis. Twin Commander explains that to make this determination, it set out to obtain fleet-wide rudder inspections. During this process, on April 4, 2003, eight days after the 2003 incident, Jeff Cousins, Twin Commander's vice president and general counsel, wrote two e-mails. The first was sent to 38 people, most of whom were service repair stations. He described the 2002 and 2003 incidents. As to the 2002 event, he said that the pilot reported temporary loss of control, the aircraft successfully landed, and the NTSB, the FAA, and Twin Commander had "been unable to ascertain quite a few facts concerning this incident. The rudder cap has not been recovered." CP at 4356. Cousins described the more recent event, too, stating that "[t]he investigation by the NTSB is still at a very early stage and quite a bit of information is still being gathered. What is known is that there was turbulence reported in the area at the affected altitudes and again the rudder cap departed the aircraft and has not been located." *Id.*

¶43 In addition, the e-mail mentions the 1992 incident, saying that it had "tearing of the rudder identical to the two recent incidents BUT the cap for that aircraft WAS recovered and is in one piece." *Id.* The message also noted the failure was between the cap and rib and the vertical spar failed in a twisting force above the rudder hinge, and the "rudder has the same appearance of the two current ones." *Id.* Cousins noted the "significant fact" "that extensive analysis was done on the Casper rudder and it failed well

(d) The requirements of paragraph (a) of this section do not apply to—

(1) Failures, malfunctions, or defects that the holder of a Type Certificate (including a Supplemental Type Certificate), Parts Manufacturer Approval (PMA), or TSO authorization, or the licensee of a Type Certificate—

(i) Determines were caused by improper maintenance, or improper usage;

(ii) Knows were reported to the FAA by another person under the Federal Aviation Regulations; or

(iii) Has already reported under the accident reporting provisions of Part 430 of the regulations of the National Transportation Safety Board.

above design load." *Id*. He explained that the NTSB was currently conducting an analysis on the two current incident rudders "but we do not have any information yet to determine cause" and were awaiting additional records. *Id*. The e-mail stated that "[u]ntil that is in[,] NO determination of cause is possible[, and] we have no evidence to point to the cap as primary cause of the problem." *Id*.

¶44 This e-mail then concluded by explaining that a draft service bulletin was being prepared but the writer was "not sure of the FAA reaction to even going that far without more information." *Id*.

¶45 On its face, this e-mail describes the 1992 incident. It does not, however, reveal material, relevant information that had to be reported. This makes sense, given that the 1992 event had already been reported and investigated and that the investigation concluded that turbulence, not the rudder system, caused the accident. On its face the e-mail also describes the 2002 and 2003 events but does not show any material, relevant information with respect to these events, either. As to the 2002 incident, the e-mail explains there were insufficient facts to reach a conclusion about the cause of the crash, and notably the rudder cap had not been found (unlike in the 1992 incident). As to the 2003 event, the e-mail points out that the investigation was not complete.[11]

¶46 Cousins sent another e-mail on April 21, 2003, which enclosed a copy of service bulletin 235, noting that it had been approved by the FAA. This e-mail discusses results of the information gathering process. In this e-mail, Cousins explained that reports from service centers showed "cracked lower horizontal stabilator ribs, cracked upper rudder ribs, and a defective forward rudder spar." CP at

---

[11] We find it telling, as well, that as Twin Commander points out, the April 4 e-mail, which does address the 1992 incident, was sent to 38 recipients, most of them repair stations. A repair station has reporting obligations, too, and is required to report to the FAA "any serious failure, malfunction, or defect of an article." 14 C.F.R. § 145.221(a). As Twin Commander points out, when trying to conceal information from the FAA, one does not disclose the information to others with reporting obligations.

2199. The Court of Appeals believed this e-mail showed information that had to be reported because Twin Commander did not advise the FAA that numerous cracked " 'stabil[izer]' " ribs were reported. *Burton*, 148 Wn. App. at 627 (emphasis omitted) (alteration in original). As Twin Commander states, however, the word actually used was "stabilator," which it says has a different meaning according to the United States Department of Transportation, FAA, *Pilot's Handbook of Aeronautical Knowledge*, FAA-H-8083, at 5-2 (2008), and is a nonrudder part of the control surface of the aircraft's tail.

¶47 Nothing in the e-mails raises a question of fact about whether Twin Commander misled the FAA or withheld information that was material and relevant to the 2004 crash. Because there is no such information in the e-mails, and Burton cites to no other evidence, Burton relies on implication and his experts' opinions that Twin Commander had the obligation to conduct additional investigations, including going back to the 1992 event and investigating the present accident in light of an already closed investigation that occurred a dozen years earlier.

¶48 But Burton's claim is not based on inadequate investigation, or any statutory or regulatory requirement to reinvestigate based upon other, separate occurrences—and in fact, any such claims are barred by the statute of repose. So instead, he recasts these theories as evidence of knowing misrepresentation, concealment, or withholding. We do not accept this end run around the statute of repose. What Burton must show, and has not, is evidence of knowing misrepresentation, concealment, or withholding of material, relevant information.

¶49 On their faces, at the most, the e-mails show that Twin Commander was investigating the rudder problem and was suspicious enough to pursue an inspection of the rudder parts of its aircraft fleet. It did so in apparent open and ongoing communication with the FAA. The e-mails do not indicate one way or another whether required information, *if any was required to be reported*, was provided to the

FAA under the reporting requirements. On their faces, the e-mails most assuredly do not contain evidence of knowing misrepresentation, knowing concealment, or knowing withholding.

¶50 We could end our analysis here. But we will discuss the expert opinions for the purpose of showing why they make no difference in our conclusion, and in light of the fact that the Court of Appeals accepted them. One expert, Robert Donham, opined that the e-mails are evidence that Twin Commander misrepresented or concealed the extent of the structural problems with the rudder system by not providing information in service bulletin 235 about the 1992 incident and the fact that rudder tearing was identical to the two more recent incidents. Another expert, William Twa, said that Twin Commander had an obligation to disclose to the FAA information about the 1992 crash in connection with the 2002 and 2003 incidents in order for necessary tests and inspections to be conducted.

¶51 These experts believed that even if the 1992 occurrence had already been reported, that was not enough because it had to be reported in conjunction with the 2002 and 2003 occurrences. The failure to do so, they believe, is evidence of knowing misrepresentation, concealment, or withholding.

¶52 This is incorrect. The experts are not pointing to any actual evidence of knowing misrepresentation, concealment, or withholding, but are instead operating from the premise that Twin Commander had a responsibility to do more than it did. As suggested, this is like arguing that Twin Commander failed to meet a required standard of care, instead of showing that it knowingly misled the FAA. Significantly, Burton does not cite any authority for the contention that Twin Commander had to reinvestigate the 1992 event, already determined by government investigators to have been caused by turbulence, and then conclude that rudder system failure was actually the problem.

¶53 In addition, insofar as Burton suggests that there was a duty to report again the 1992 crash, we note

that there are exceptions to the reporting requirement for failures, malfunctions, or defects that were already reported to the FAA or reported under provisions of the NTSB's regulations. 14 C.F.R. § 21.3(d)(1)(ii). We do not decide if either exception applies here, but these exceptions do demonstrate that it is generally unnecessary for the FAA to be provided reports of a previously reported failure, malfunction, or defect posing safety risks, as defined in 14 C.F.R. § 21.3(c). This shows that repeated reporting is not required. Indeed, multiple reportings can cause serious problems for the FAA, which has a limited number of employees to handle them. *Cf. Rickert*, 923 F. Supp. at 1458 (regulation does not require a report whenever there is a difference of opinion or whenever an engineer, pilot, or citizen advises the manufacturer that a particular aircraft should have been designed differently or is flawed; if the failure to report differences of opinion is a "withholding," then parties could bring suits 40 years after manufacture based on an engineer's belief the design is flawed but the manufacturer did not report this).

¶54 Accordingly, we view with great skepticism the ideas that an already investigated occurrence must be reinvestigated, or that an already reported event must be re-reported. The 1992 event was reported and the NTSB concluded that it was caused by turbulence. The FAA also received reports of the 2002 and 2003 events. Burton cannot defeat summary judgment with these theories.

¶55 In addition, we emphasize that 14 C.F.R. § 21.3(a), (b), and (d) require a type certificate holder to report failures, malfunctions, or defects in any product it manufactured only if "it determines" this has resulted or could result in specified safety risks. The e-mails do not show that any such determination had been made by Twin Commander, and for this reason, too, we do not agree that the evidence is sufficient to show a material issue of fact as to a knowing misrepresentation, withholding, or concealment. The April 21 e-mail does not support Burton's assertion that Twin Commander had determined that the rudder

caps were defective or that there was a material relationship between the 1992 incident and the ones that were more recent. Rather, it shows that Twin Commander was still investigating and did not know if the rudders caused or could cause risks of the type listed in 14 C.F.R. § 21.3.

¶56 But all of this aside, and returning to our primary holding, the bottom line is that Burton failed to produce evidence creating a question of fact as to whether Twin Commander knowingly misrepresented, concealed, or withheld required information. It must be said that Burton has amassed a huge amount of information, and it is possible that it might show negligence on Twin Commander's part in testing and investigation. But a negligence claim is barred by the statute of repose, as are Mr. Burton's strict liability claims, unless the "fraud exception" applies. What is required here is evidence of knowing misrepresentation, concealment, or withholding of information that is required to be reported. And this kind of evidence is simply lacking.[12]

¶57 Finally, we note that in cases where the fraud exception has been at issue and plaintiff survived summary judgment, there was in fact evidence of concealment. In *Butler*, 109 Cal. App. 4th 1073, the manufacturer knew its helicopter's tail rotor yokes had failed in five accidents after less than 2,400 hours of use but still instructed its users to increase the retirement life of the tail rotor yokes from 4,000 to 5,000 hours, did not perform additional stress tests, and misrepresented to the FAA that it had performed those tests. In *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631 (E.D. Pa. 2004), the manufacturer represented to the FAA in an engineering report that vibratory stress on its aircraft's propeller was approximately the allowable value when in fact it exceeded the allowable limit. This was a design flaw that was likely to have caused propeller failure.

---

[12] We also note that the record shows there was a wealth of communication between the FAA and Twin Commander about what Twin Commander knew about the rudders, rudder tips, and results of the rudder inspections. Pierre DeBruge, Twin Commander's engineering manager, logged more than 200 communications with the FAA, and his declaration suggests no misrepresentation or concealment.

In these cases there was evidence of a knowing misrepresentation, concealment, or withholding, unlike in the present case where there is no such evidence.

¶58 We conclude that the Court of Appeals erred in concluding that Burton has established that there is an issue of material fact about whether Twin Commander failed to meet its reporting requirements under 14 C.F.R. § 21.3 and thus a question of fact about whether the "fraud exception" applies.

## CONCLUSION

¶59 We reverse the Court of Appeals determination that whether Twin Commander is a manufacturer presents an issue of material fact. The meaning of "manufacturer" under GARA is a question of law to be decided by the court. A type certificate holder steps into the shoes of an original manufacturer and is subject to the requirements for reporting failures, malfunctions, or defects posing safety risks as enumerated in 14 C.F.R. § 21.3(c), and is obliged to provide ongoing support for the aircraft for which it holds type certificates. Accordingly, it is a manufacturer under GARA. Therefore, Twin Commander, as the type certificate holder for the aircraft that crashed in Mexico, is a manufacturer.

¶60 We also reverse the Court of Appeals determination that Mr. Burton has presented sufficient evidence on the issue whether Twin Commander knowingly misrepresented to, or knowingly concealed or withheld from the FAA material, relevant information about the rudder system. The evidence is insufficient to raise a genuine issue of material fact on this matter, and therefore insufficient to survive summary judgment on the question whether an exception to GARA's statute of repose applies in this case. Accordingly, the trial court properly granted summary judgment in favor of Twin Commander on the ground that

GARA's 18-year statute of repose applies to bar these wrongful death actions.

C. JOHNSON, ALEXANDER, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶61 STEPHENS, J. (dissenting) — In granting summary judgment, the majority impermissibly puts the burden on Kenneth Burton to establish the applicability of GARA's (the General Aviation Revitalization Act of 1994[13]) so-called fraud exception as a matter of law. It essentially resolves important factual disputes and misreads the relevant reporting requirements. I would affirm the Court of Appeals and remand this case for trial. While I agree with the majority that the meaning of "manufacturer" under GARA is a question of law and that Twin Commander is a manufacturer, genuine issues of material fact regarding the applicability of the fraud exception remain. Accordingly, I respectfully dissent.

### Standards on Summary Judgment

¶62 The majority errs in the first instance by failing to apply established standards regarding summary judgment. "The purpose of summary judgment is to avoid a useless trial when there is no genuine issue of any material fact." *Olympic Fish Prods., Inc. v. Lloyd*, 93 Wn.2d 596, 602, 611 P.2d 737 (1980). "The burden of proving by uncontroverted facts that no genuine issue exists is upon the moving party." *Id.* In contrast to this well-settled principle, the majority contends that Burton "must plead and prove facts that would prove the fraud exception." Majority at 222. The majority believes this is so because of GARA's requirement that facts necessary to prove a knowing misrepresentation, withholding, or concealment must be pleaded with specificity. *Id.* (quoting GARA § 2(b)(1)).

---

[13] Pub. L. No. 103-298, § 2, 108 Stat. 1552 (1994) (codified at 49 U.S.C. § 40101 note).

¶63 But with this reasoning, the majority mistakenly collapses a pleading requirement into the standards on summary judgment. Burton's obligation is to plead facts necessary to prove fraud. It is then up to a fact finder to determine whether those facts do indeed prove fraud. The question on summary judgment is completely separate— whether there is a genuine issue of material fact regarding the applicability of GARA § 2(b)(1). The majority's reasoning places an impossible and impermissible burden on a party seeking exception to GARA's statute of repose to prove his case a matter of law on the face of his pleadings in response to the moving party's summary judgment motion.

¶64 We review summary judgment rulings de novo. "Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). "After the moving party submits adequate affidavits [showing there is no genuine issue of fact], the nonmoving party must set forth specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact." *White v. State*, 131 Wn.2d 1, 9, 929 P.2d 396 (1997). The ultimate burden remains at all times on the moving party. *See Balise v. Underwood*, 62 Wn.2d 195, 199, 381 P.2d 966 (1963). "[R]easonable inferences from the evidence must be resolved against the moving party." *Folsom*, 135 Wn.2d at 663. Thus, it is Twin Commander's burden to show there is no genuine issue of material fact, and it is Burton's obligation to identify facts that raise reasonable inferences as to the applicability of GARA § 2(b)(1). It is not Burton's burden on summary judgment to present us with a " 'smoking gun,' " as the majority seems to require. Majority at 224. When these standards remain in focus, summary judgment is inappropriate in this case.

*Required Information*

¶65 An FAA (Federal Aviation Administration) regulation defines required information as that which concerns (1) failures, malfunctions, or defects (2) in a product or part manufactured by the type certificate holder (3) that the type certificate holder has determined resulted in, or could result in, one of 13 serious occurrences. 14 C.F.R. § 21.3(a).[14] This requirement does not apply, however, to failures, malfunctions, or defects that were "caused by improper maintenance, or improper usage," or that the type certificate holder "[k]nows were reported to the FAA by another person under the Federal Aviation Regulations" or that the type certificate holder "[h]as already reported under the accident reporting provisions of Part 430 of the regulations of the National Transportation Safety Board [(NTSB)]."[15] 14 C.F.R. § 21.3(d)(1)(i), (ii), (iii).

¶66 The GARA § 2(b)(1) exception applies only where a manufacturer has failed to disclose required information. 14 C.F.R. § 21.3. Burton argues that Twin Commander failed to report or misrepresented to the FAA several events involving aircraft of the model line in question where there was rudder damage similar or identical to the rudder damage in the accidents that precipitated "Alert Service Bulletin 235" (SB 235) and contributed to the accident in question here.

¶67 Specifically, Burton contends that Twin Commander failed to disclose rudder information related to (1) a 1970

---

[14] The occurrences are (1) fires; (2) engine exhaust system failures; (3) accumulations or circulation of toxic or noxious gases in the crew or passenger compartments; (4) malfunctions of the propeller control system; (5) propeller or rotorcraft hub or blade structural failures; (6) flammable fluid leakage; (7) brake system failures; (8) significant aircraft primary structural defects; (9) abnormal vibration or buffeting caused by structural or system malfunctions; (10) engine failures; (11) structural or flight control system malfunctions; (12) complete losses of more than one electrical power generating system or hydraulic power system; or (13) failures of more than one attitude, airspeed, or altitude instrument. 14 C.F.R. § 21.3(c).

[15] The current federal code of regulation does not appear to include a "Part 430," so it is not clear how a court is to apply or interpret this aspect of 14 C.F.R. § 21.3.

crash involving a prototype of a predecessor to the 690C model (prototype crash); (2) the results of a 1979 flutter test by Twin Commander's predecessor type certificate holder, Gulfstream (flutter test report); (3) a 1982 crash in Arkansas in which the airplane's rudder horn assembly was never found (Arkansas crash); (4) a 1992 crash in Denver in which tearing of the rudder was observed (Denver crash); (5) four other cases of problems with the rudder cap (other cases); (6) a 2002 crash in Texas in which the rudder cap separated from the plane in flight (Texas crash); and (7) a 2003 crash in Georgia in which the rudder cap also separated from the plane during flight (Georgia crash).

¶68 In light of the evidence presented by Twin Commander, the Court of Appeals agreed Twin Commander had not concealed or misrepresented the existence of these various events or occurrences. *Burton v. Twin Commander Aircraft, LLC*, 148 Wn. App. 606, 626, 221 P.3d 290 (2009). It noted that in fact "there is no dispute that each of the accidents [was] reported to the FAA." *Id.* at 627 n.18. But, the Court of Appeals concluded there was no evidence Twin Commander had reported information concerning the 1992 accident *in relation to* the 2002 and 2003 crashes. *Id.* at 626. The Court of Appeals agreed with Burton that a trier of fact could find that, had the FAA known about similarities between the 1992, 2002, and 2003 crashes, SB 235 might have been drafted differently. In other words, the fact that Twin Commander failed to "connect the dots" between the various accidents for the FAA raised "material issues of fact about whether Twin Commander knowingly misrepresented, or concealed, or withheld relevant and material information from the FAA in obtaining approval of SB 235." *Id.* at 627.

¶69 The similarities between the 1992, 2002, and 2003 incidents support an inference that the GARA § 2(b)(1) exception applies here. In an April 4, 2003 e-mail, Twin Commander's vice-president/general manager, Jeff Cousins, wrote that following the 2003 crash, Twin Commander began investigating all the records it had of aircraft in-

flight breakups and found similarities between the 2002 and 2003 incidents and the 1992 Denver crash. Clerk's Papers (CP) at 4356. Although Twin Commander knew in 2003 that the NTSB had determined in 1993 that the 1992 crash was caused by pilot error and turbulence, the April 4, 2003 e-mail from Cousins suggests that Twin Commander's subsequent investigation raised concerns about whether there was a connection between the rudder damage in 1992, 2002, and 2003. Moreover, the fact that it then drafted a service bulletin regarding its fleet's rudder assembly suggests it believed there might be a problem with its rudder assembly that could contribute to accidents.

¶70 Contrary to the majority's view, the possible connection between the 1992, 2002, and 2003 rudder problems falls within the definition of information required to be reported under 14 C.F.R. § 21.3. That regulation reads in part:

> Except as provided in paragraph (d) of this section, the holder of a Type Certificate . . . shall report any failure, malfunction, or defect in any product, part, process, or article manufactured by it that it determines has resulted in any of the occurrences listed in paragraph (c) of this section.

14 C.F.R. § 21.3(a). The majority reads the "it determines" language as its own exception to the regulation's reporting requirements, reasoning that before a manufacturer's reporting obligation is triggered, it must engage in an investigation to determine whether the failure at issue caused one of the listed occurrences. Majority at 224-26. This is an unnatural reading of the regulation's plain language. 14 C.F.R. § 21.3 does not require that a type certificate holder determine the failure *caused* the stated occurrence before reporting it or that it determine what caused the failure, but rather that the failure did or could *result* in one of the occurrences listed. The determination contemplated in 14 C.F.R. § 21.3(a) is a very low threshold, far short of legal causation and one that the evidence suggests was met here. Cousins described the incidents involving the rudder apparatus as "failures." CP at 4356. He stated that a rudder cap

"departed the aircraft" and that the plane "came apart in flight." *Id*. In other words, the failure of the rudder apparatus resulted in the plane literally breaking apart in flight. This encompasses at least one occurrence listed in 14 C.F.R. § 21.3(c)(11): "[a]ny structural . . . malfunction, defect, or failure which causes an interference with normal control of the aircraft for which derogates the flying qualities." The majority errs when it reads the determination language of 14 C.F.R. § 21.3(a) as requiring a "cause and effect analysis" on the part of the type certificate holder. Majority at 226. Twin Commander was not excused from the reporting requirements under 14 C.F.R. § 21.3(a).

¶71 The exceptions to the reporting requirement of 14 C.F.R. § 21.3 lie not in subsection (a), but in subsection (d). Likewise, the manufacturer's opportunity to investigate and conclude that information is not required under the C.F.R. arises in subsection (d), not subsection (a). But subsection (d) applies only where the manufacturer (i) *has determined* that the failures, malfunctions, or defects at issue were caused by improper maintenance or usage; (ii) *knows* they were reported to the FAA by another person pursuant to regulations; or (iii) has already reported them under a specific provision, "Part 430" of the NTSB regulations, and Twin Commander cannot avail itself of these exceptions to the reporting requirement.

¶72 Critically, Twin Commander makes no attempt to show prior reporting by any other person or pursuant to NTSB part 430 of the similarities between the 1992 crash and the 2002 and 2003 incidents that it found in its independent investigation following the 2003 accident. Twin Commander does argue that the information concerning the similarities between the 1992, 2002, and 2003 rudder damage is not required information because Twin Commander's causation determination excused it from the reporting obligation. But this argument is premised on a misapprehension of the causation provision. First, the language of the C.F.R. excuses reporting when the manufacturer has *affirmatively determined* the failure at issue was

caused by improper maintenance or usage. Twin Commander concedes it had made no such determination at the time the April 4, 2003 e-mail was drafted. Suppl. Br. of Pet'r at 19.[16] Second, Twin Commander refers to the portion of GARA § 2(b)(1) that limits the information manufacturers must report to that which "is causally related to the harm which the claimant allegedly suffered." GARA § 2(b)(1). This portion of GARA is unclear with respect to who makes the causal determination. Twin Commander argues that the manufacturer must "determine[ ] itself that the incident was caused by the product defect." Br. of Resp'ts at 35-36 & n.8. Burton counters that causation is a question for the trier of fact unless it is undisputed that there was no relationship between the information withheld from the FAA and the accident. Suppl. Br. of Resp'ts at 15-16. Burton's view is supported by *Butler v. Bell Helicopter Textron, Inc.*, 109 Cal. App. 4th 1073, 1087-88, 135 Cal. Rptr. 2d 762 (2003), in which the California Court of Appeal reasoned that the question under the statute is not what causal connection the manufacturer identified in deciding whether it was required to report to the FAA, but rather what the FAA would have done in response to the information that the plaintiff alleges the manufacturer failed to report.

¶73 This makes sense. A manufacturer should not be able to avoid a question of fact on causation under GARA by simply citing to its own view of the matter. Here, though Twin Commander presented evidence that the causes of at

---

[16] It should be noted that the NTSB determined that the probable cause of the 1992 accident was pilot error coupled with turbulence. CP at 1335. The NTSB ultimately found the probable cause of the 2003 accident was "[a]n in-flight encounter with unforecasted severe turbulence in cruise flight resulting in the design limits of the airplane being exceeded due to an overload failure of the airframe, and collision with a swampy area." CP at 1361. But regardless of the causes of those accidents as determined by the NTSB, if Twin Commander was concerned that there was a pattern of rudder failure in accidents involving its fleet—and an inference can be drawn from the April 4, 2003 e-mail that it was concerned—it was required to share that information with the FAA in connection with developing SB 235. The majority therefore misses the mark when it discusses at length its belief that the similarities between these accidents need not have been reported because the fact of the accidents already had been reported. Majority at 228-30.

least two accidents cited by Burton were either unknown or not caused by a faulty rudder assembly. CP at 1335, 1361. Burton offered evidence, including expert testimony, disputing Twin Commander's evidence and supporting its view that the FAA would have acted more aggressively, including possibly grounding the accident aircraft, had it known the information it claims Twin Commander did not report. Suppl. Br. of Resp'ts at 14-15. Reasonable minds could differ as to whether the causation element was met, precluding summary judgment on this basis.

¶74 In sum, Twin Commander does not show it was exempt *as a matter of law* from disclosing to the FAA the information it had about the similarities between the 1992, 2002, and 2003 rudder damage. Other courts considering the question of required information have held that prior similar failures must be reported to the FAA. *Butler*, 109 Cal. App. 4th at 1083; *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 649-50 (E.D. Pa. 2004). *Butler* and *Robinson* are distinguishable on their facts because the evidence of the defendants' alleged concealments was much more obvious than in this case, as the majority notes. Majority at 231-32. But to survive a summary judgment attack, a plaintiff needs only the reasonable inferences arising from the evidence presented, not irrefutable certainties. Such inferences can be drawn from the evidence presented here.

## *Factual Inconsistencies*

¶75 Finally, the majority accepts at face value Twin Commander's version of the facts, which is unsupported by or disputed in the record and therefore not appropriate for summary judgment. For example, the majority claims that Twin Commander pursued its investigation of its fleet "in apparent open and ongoing communication with the FAA." Majority at 228. While the majority does not cite to the record in support of this contention, I assume it refers to the declaration of Twin Commander's engineering manager

during the relevant time period, Pierre DeBruge. CP at 1175-78 (Decl. of Pierre DeBruge). DeBruge states that he worked closely with the FAA during the drafting of SB 235, "including by sharing and discussing the information known by Twin Commander about the rudders, rudder tips, and the results of the rudder inspections, and discussing and deciding what actions to take going forward." CP at 1178. But while DeBruge's statements refer to discussion with the FAA about the 2002 and 2003 incidents, as well as reference to disclosure of Twin Commander's observations of wear and tear on its fleet, *there is no mention at all of whether Twin Commander discussed with the FAA its observations regarding the similarities between the 1992, 2002, and 2003 incidents.*

¶76 In addition to questions about whether Twin Commander disclosed its concerns about the similarities between the 1992, 2002, and 2003 incidents, Burton also raises an issue of fact about the extent to which Twin Commander shared with the FAA more recent observations about rudder damage that arose from its inspection of its fleet following the 2003 Georgia crash. Burton points to an April 21, 2003 e-mail from Cousins that noted several reports from service centers about problems with the fleet's rudder assembly, including "cracked lower horizontal stabilator ribs." CP at 2199. Burton's expert, Robert Donham, declared that he reviewed the documentation Twin Commander provided to the FAA for approval of SB 235 and that Twin Commander did not advise the FAA that its service centers were reporting cracked lower horizontal stabilator ribs. CP at 1137. In response, Twin Commander relies on the declaration of DeBruge to argue that it discussed with the FAA the information it collected about its fleet from its service centers, which could presumably include the observations about the stabilator ribs but does not necessarily include such information. Suppl. Br. of Pet'r at 12-13 (citing CP at 1178). This presents a significant factual dispute as to what information Twin Commander did and did not share with the FAA, making the issue of whether Twin Commander

knowingly misrepresented, withheld, or concealed information from the FAA inappropriate for summary judgment.

¶77 Moreover, apart from disputing whether Twin Commander disclosed this information to the FAA, the parties dispute the nature of the information. Donham believes Cousins misspoke when he wrote that the service centers reported cracked "stabilator" ribs and that the correct term is "stabilizer" ribs. CP at 1137. In supplemental briefing, Twin Commander argues that Donham is wrong; "stabilator" and "stabilizer" mean two different things, and a stabilator rib has nothing to do with an aircraft's rudder assembly. Suppl. Br. of Pet'r at 11 (citing U.S. Dep't of Transp., FAA, Pilot's Handbook of Aeronautical Knowledge, FAA-H-8083-25A, at 5-2 (2008)). This court is not equipped to rule on a question of fact concerning the finer points of aeronautical engineering. The apparent dispute between the parties regarding the damage observed by the service centers presents yet another reason why summary judgment is inappropriate as to the GARA § 2(b)(1) exception because it goes to the question of what Twin Commander knew. Nevertheless, the majority accepts Twin Commander's factual assurances as to aircraft mechanics.

*Knowing Misrepresentation, Withholding, or Concealment*

¶78 Even if the majority agreed with the foregoing analysis, it would likely still argue that Burton has not shown a *knowing* misrepresentation, withholding, or concealment. The majority notes, for example, that Twin Commander sent the April 4, 2003 e-mail to several repair stations, which have an independent obligation to report any defects to the FAA, reasoning that such action tends to negate a showing of knowing concealment. Majority at 227 n.11.

¶79 But at least one of Burton's experts opined that information discussed in an e-mail from Jeff Cousins was not repeated in Twin Commander's communications with

the FAA during the drafting of SB 235 and that the undisclosed material was relevant to the efficacy of the bulletin. CP at 1136-38. This raises at least a reasonable inference of a knowing misrepresentation, withholding, or concealment. Likewise, that expert also opined that it is reasonable to expect Twin Commander would have given "due engineering consideration, in connection with [SB] 235, to [similarities between different crashes]." CP at 1136. Because Twin Commander did not share with the FAA its knowledge of the similarities between crashes when preparing the service bulletin, Burton raises a reasonable inference that the withholding may have been knowing.

¶80 As noted above, even in the context of summary judgment, "GARA requires more than innuendo and inference; it demands 'specificity.'" *Rickert v. Mitsubishi Heavy Indus., Ltd.*, 923 F. Supp. 1453, 1462 (D. Wyo. 1996) (*Rickert I*). Twin Commander argues that under this heightened standard, Burton has failed to meet his burden, and the majority agrees. But the foregoing analysis establishes that Burton has identified genuine issues of material fact about at least two instances where Twin Commander may have knowingly failed to share required information with the FAA: with respect to the similarities it discovered between the 1992, 2002, and 2003 accidents and with respect to service center reports about the extent of the fatigue observed on the fleet's rudder assembly. These are specific enough instances to satisfy GARA's pleading requirement and they are certainly specific enough to survive a summary judgment attack.

## Conclusion

¶81 The majority improperly shifts the burden on summary judgment to Burton and imposes an impermissibly high burden at that. Moreover, the majority misreads the reporting requirements of 14 C.F.R. § 21.3. Read correctly, the regulation does not excuse Twin Commander from

reporting certain information as a matter of law. Finally, the majority ignores a number of clear factual disputes between the parties that render this matter inappropriate for summary judgment. I would remand this case to the trial court for a fact finding determination on whether the GARA § 2(b)(1) exception puts Burton's claim against Twin Commander outside the statute of repose. I respectfully dissent.

CHAMBERS, J., and SANDERS, J. PRO TEM., concur with STEPHENS, J.

Reconsideration denied August 3, 2011.